[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 20, 2010
JOHN LEY
CLERK

_____

No. 09-12728

_____

D. C. Docket No. 04-00301-CV-2-WKW-SRW

DARRYL PIERRIE HALL,

Petitioner-Appellant,

versus

WILLIE THOMAS,
Warden,
TROY KING,
Attorney General of the State of Alabama,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(July 20, 2010)

Before HULL, WILSON and FARRIS,[*] Circuit Judges.

HULL, Circuit Judge:

Alabama prisoner Darryl Pierrie Hall appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After review and oral argument, we affirm.

## I. BACKGROUND

In Alabama state court, Hall was convicted of three counts of first-degree robbery and four counts of second-degree kidnaping.[1] He received concurrent sentences of life imprisonment on each robbery conviction and twenty years' imprisonment on each kidnaping conviction. Hall's § 2254 petition claims that his confession was not knowing and voluntary and his trial counsel was ineffective.

### A. Hall's Arrest and Indictment

The state charges against Hall stem from his participation with Alonzo Leak in a robbery and kidnaping on October 15, 1999. Leak and Hall, both juveniles, kidnaped and robbed four adults (three women and one man) at the Little People's Workshop, a day care center in Montgomery, Alabama. Leak raped one of the

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]Hall was originally indicted for rape and sexual abuse as well as robbery and kidnaping. Hall was tried three times. In the first trial, the jury acquitted Hall of the rape and sexual abuse charges but was unable to reach a verdict on the robbery and kidnaping charges. There was a hung jury at the second trial. Hall was convicted of robbery and kidnaping at the third trial.

women and tried to rape another. At the time of the crimes, Leak was 17 and Hall was three weeks shy of his 16th birthday.

The district court summarized Leak's involvement as follows:

In the early evening hours of October 15, 1999, Leak entered [the] day care center . . . and pulled a gun on its owner. He then corralled the owner and the other adults in the building, a parent and her male friend, and herded them into a bathroom. He took them out of the bathroom in stages and had them bind each other, but placed them in various rooms in the small center. He periodically left them unattended and would return to ask the owner for information related to items in the building. After the victims were bound, another parent came into the center to pay her day care fees. Leak threatened her with a gun, and she complied with his request to bind the remaining unbound victim, and then, he proceeded to rape her. He attempted to rape the other parent as well, physically assaulting her with his hands and gun, and using others to disrobe her. He never followed through on the rape because the victim lied and said she had a sexually transmitted disease . . . . Leak eventually left, and the victims called for help.

Hall v. Thomas, 623 F. Supp. 2d 1302, 1305-06 (M.D. Ala. 2009) (footnote omitted). As to Hall's involvement, the district court pointed out that no victim actually saw Hall: "The victims testified that throughout the encounter there appeared to be other accomplices in the building or that Leak spoke of other accomplices, but no one witnessed another participant." Id. at 1306.

The day after the crimes, police identified Leak as a perpetrator, arrested and took him to police headquarters, and questioned him, at which time Leak immediately implicated Hall. Id. Hall lived near the Little People's Workshop and

3

used to attend it.  Id.  Leak told police that "Hall told him that committing the crimes would position Leak to join a gang, and that Hall was outside the center during the attack providing advice to him on how to carry out the crimes."  Id. at 1306.

On October 17, 1999, two days after the crimes and one day after Leak's arrest, police officers, including Officer M. L. Major, came to Hall's house.  Id. Hall's parents were home and invited Major into the house.  Id. Officer Major arrested Hall and brought him to the police station.  Prior to any questioning, Officers Major and W. T. Grant read Hall both his Miranda rights and the state-required warning for juveniles subject to interrogation.  Id.  Hall signed forms waiving those rights.  Id.  Hall confessed to the robbery and kidnaping crimes.[2]  Id. His confession was recorded on audiotape.

An Alabama grand jury indicted Hall on three counts of first-degree robbery and four counts of second-degree kidnaping.  Hall pled not guilty.

**B.     Officer Major's Testimony in Suppression Hearing**

On March 9, 2000, Hall filed a motion to suppress his audiotaped confession, arguing it was involuntary, coerced, and made without a knowing and intelligent waiver of his right to counsel.  Hall alleged that his parents were not

---

[2]Hall did not confess to the rape or sexual abuse crimes and, as noted earlier in footnote 1, supra, was acquitted of those charges in the first trial.

4

permitted to be present and that the officers obtained his confession through

"[p]sychological ploys, threats and promises, fatigue and physical violence" in

violation of the Fifth and Fourteenth Amendments.

The state trial court held a suppression hearing. Six witnesses testified,

including Officer Major, Hall's father, and Hall.

Officer Major testified about his investigation and about Leak's and Hall's

statements. After Leak implicated Hall, Officer Major went to Hall's house and

arrested him. Officer Major advised Hall of the crimes he was being arrested for

but did not question Hall at his house or read his Miranda rights then. Hall's

mother and father were present at Hall's house and observed Hall's arrest.

At the police station, Hall was taken to Officer Major's office to be read his

Miranda rights and questioned. Hall's left arm was handcuffed to the desk, which

Officer Major testified was standard procedure. Hall's right hand was free.

Before any questioning, Officer Major read Hall both his state juvenile

rights and his adult Miranda rights forms.[3] Officer Major testified that he also gave

---

[3]Rule 11(B) of the Alabama Rules of Juvenile Procedure (in effect at the time of Hall's arrest and his later trials), provided for the rights of a child who is in custody but has not yet been questioned. Rule 11(B) provided as follows:

> Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
> > (1) That the child has the right to counsel;
> > (2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
> > (3) That the child is not required to say anything and that anything the child says

5

Hall an opportunity to read the forms on his own. Hall read and signed both forms, confirming he understood his rights and agreed to answer questions. The content of the state juvenile rights form made it clear Hall had a right to remain silent, a right to counsel, and a right to communicate with his parent before questioning as follows:

> Before asking you any questions, I must explain to you that you can remain silent, <u>that anything you say can be used against you in court</u>, that you can talk to a lawyer first, and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. If you want to answer questions now before you – if you want to answer now, you can do so, but stop answering at any time. <u>You have the right to communicate with your parent or guardian before questioning and, if necessary, reasonable means will be provided for you to do so</u>.

(Emphasis added). Officer Major signed the form to indicate that he had read this paragraph to Hall. The form also contained this paragraph that Hall read aloud to Officer Major, and which Officer Major then read back to him, stating Hall was willingly answering questions and knew what he was doing:

> I fully understand the foregoing statement and do willingly agree to

---

> may be used against the child;
> (4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so.

<u>Russell v. State</u>, 739 So.2d 58, 66 (Ala. Crim. App. 1999) (quoting Ala. R. Juv. P. 11(B)). As of January 9, 2009, § 12-15-202(b) of the Alabama Code provides these same rights to a child taken into custody prior to questioning, and Rule 11 has been rescinded.

answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

Hall also signed below this paragraph indicating he had read it. The state juvenile rights form was dated October 17, 1999 and indicated that Officer Major read the form to Hall at 5:42 p.m.

Out of an abundance of caution, Officer Major then also read aloud, and Hall also signed, the adult Miranda rights form at 5:44 p.m. The only difference between the state juvenile rights form and the adult Miranda rights form was that the adult form did not contain this sentence: "You have the right to communicate with your parent or guardian before questioning. If necessary, reasonable means will be provided for you to do so." Otherwise, the forms were the same.

During trial, Officer Major testified that after Hall signed the forms waiving his state juvenile rights and his Miranda rights at 5:42 p.m. and 5:44 p.m., respectively, and before taking Hall's taped statement at 7:06 p.m., Officer Major and Hall "sat there and generally talked," and Officer Major then "jotted a few things down" and went and talked to his supervisor. Paperwork was also completed in the intervening time. When the audiotaping began at 7:06 p.m., Officer Major again read both the state juvenile rights and adult Miranda rights. On the audiotape, Hall again said that he understood both his state juvenile rights and his adult Miranda rights. Officer Major testified that Hall "said yes, sir to both

7

his juvenile rights, because I read both of them on tape to him, and he said yes, sir

to his adult rights as well. They were both read to him." At the end of the

confession, Hall again confirmed on audiotape that he had twice been advised of

his state juvenile rights and adult <u>Miranda</u> rights by Officer Major, and that he

understood them. Hall also stated that no threats had been made to him. The

audiotape of the statement began at 7:06 p.m. and ended at 7:26 p.m.[4]

Officer Major testified that Hall's father wanted to come to the police station

and was at the police station but did not ask to be in the room during the

questioning.[5] According to Officer Major, Hall himself never asked for his father

---

[4]A transcript of this taped statement is attached as an appendix to this opinion.

[5]Officer Major testified about his interaction with Hall and Hall's father as follows:
Q. You took the young man downtown, correct?
A. We took him to police headquarters, yes, sir.
Q. Didn't the father say I would like to be there when you question him?
A. The father was at headquarters on the back desk. <u>These rights clearly state that the son has to ask for the father</u>.
Q. At the house when you handcuffed him and you were taking him down --
A. I advised his father to come to police headquarters.
Q. Did [the father] say he wanted to be there when you questioned the young man?
A. No, he did not.
Q. He did not. Did the young man say he wanted his father to go with him?
A. He said that he wanted his parents.
Q. Okay.
A. He said . . . I asked him the question. He said he wanted his parents to come down. When we read him his juvenile and his adult <u>Miranda</u> rights, <u>he never asked for his parents because I asked him several times</u>.
. . .
Q. When you were at the house and you handcuffed him?
A. I did not have a rights form. No, I did not read him his rights.
Q. So you did not read his rights at that time?
A. No, sir.

8

to be in the room with him. Officer Major did not ask Hall's father if he wanted to come in. During the suppression hearing, Hall's attorney asked Officer Major whether, at the time of Hall's arrest at his home, Hall's father said he wanted to be present for the questioning. Officer Major responded the father said he wanted to be present but the fact remains that the son, after being read his rights, never asked for his father or an attorney:

> I don't remember . . . [the father's] exact words. I know he said he wanted to be present; therefore, I told him how to get to police headquarters. He came down. The fact remains, when his son was read his <u>Miranda</u> rights, he did not ask for his father. He did not ask for his mother. He did not ask for an attorney. He didn't ask for anybody. All he said was, yes, sir, I understand. Do you want to answer questions now? Yes, sir. That's all that happened.

Officer Major later testified that he went outside and walked by Hall's father sitting on a bench, and Officer Major did not recall Hall's father saying anything to him. Neither Officer Major nor anyone else made any promises or threats to Hall.

---

Q.   His father said I would like to go down there and be there when you questioned him. Is that true?
A.   And his father was present at police headquarters. <u>The son did not ask for his father to be in the room present, period, at all. He did not ask for his father</u>.

Q.   Did you ask the father if he wanted to come in?
A.   No, I did not.
Q.   The father wanted to be there?
A.   <u>The son has to request for his father</u>.

(Emphasis added).

9

They did not coerce or trick Hall into making a statement.[6]

In summary, Officer Major read Hall his state juvenile rights at 5:42 p.m. and adult Miranda rights at 5:44 p.m. Hall then read them himself. The officers then questioned Hall for a little over an hour, during which time Hall confessed. The officers then audiotaped Hall's confession from 7:06 p.m. to 7:26 p.m., which included Officer Major's second reading of Hall's state juvenile rights and adult Miranda rights at the beginning of the audiotape and an additional confirmation by Hall at the end of the audiotape that he twice had been read both his state juvenile rights and adult Miranda rights. This means within a space of one hour and 15 minutes, Officer Major told Hall out loud four times that he had a right to remain silent and a right to counsel and twice that he had a right to have his parent present before questioning. Hall read his rights too and twice said he understood them. According to Officer Major, Hall waived his rights before confessing and did not request his father's presence during questioning.

## C.    Father's Testimony in Suppression Hearing

Curtis Hall, Hall's father, also testified and his account differs in some respects from Officer Major's. When Officers Major and Grant came to his house

---

[6]In addition to Officer Major, Officer Grant was present during Hall's arrest and questioning and testified that Hall was read his state juvenile rights and adult Miranda rights and signed the waiver forms. Hall did not appear to be scared. Officer Grant did not hear Hall's father ever request to be present during Hall's questioning.

and arrested Hall, Curtis Hall asked Officer Major, "since you are the one doing all the talking, shouldn't me as a parent or an attorney be present when y'all get ready to question Darryl?" Officer Major replied, "yes, you can." The officers took Hall to the police station in a patrol car.

Curtis Hall went on his own to the police station. He waited in a hallway for ten to fifteen minutes. Officers Grant and Major walked past him. According to Curtis Hall, Officer Major said, "We will call you when we get started." Curtis Hall stayed another fifteen to twenty minutes. He finally went downstairs, and Officer Major showed him to a bench down there. Curtis Hall stayed on that bench "anywhere from forty-five minutes to an hour, maybe a little longer than that."

At one point, Officer Major came out of the interview room complaining of a headache, and Curtis Hall asked whether they had started questioning Hall. According to Curtis Hall, Officer Major replied, "Yes. He is lying but we will get it out of him," and then Officer Major "turned around and went right back quick." Curtis Hall testified, "[s]till [the officers] never come and asked me, tell me they had started the interrogation. I am sitting there waiting to go in there." Curtis Hall never entered the interview room. Officer Major did tell Curtis Hall that Hall was read his rights and understood them. Curtis Hall never saw his son at the station

until Hall came out of the interview room.[7]

## D. Hall's Testimony in Suppression Hearing

Defendant Hall also testified about the questioning. After being arrested and put into the police car, Defendant Hall heard his father ask if he could be present when Hall was being questioned. Officer Major told Hall's father he could. At the police station, before the officers began questioning him, Hall asked about his father:

> I said, where is my daddy? I thought my daddy was supposed to be here when y'all are questioning me. They said, don't worry, he is upstairs.

Hall testified that the officers handcuffed him to the desk and threatened him during the questioning:

> First they read all that what Alonzo said. Then they said, is this true? I said, no, sir. Then Grant said, why are you lying? I said, I ain't lying, sir, I promise you. Y'all got the wrong one. The other man said, stop lying, we know you did it . . . . I said, I don't know nothing about it, I want to go home . . . . He said, I am tired of you lying to me, son. He pointed to Mr. Grant. Mr. Grant came around. He kicked the chair and turned it around and the thing clamped real hard and squeezed my arm. I said, I don't know what you are talking about, sir. Then the other man said, we know you did it. I said, no, I didn't. He kicked it again. Then it hurt more. Everything on my body was shaking. He said, I am tired of you children lying. I said, I don't know what you are talking about. He said, why are you lying? He hit the desk. Grant did just like that. I jumped. He kicked it again

---

[7]Curtis Hall's time estimates are consistent with the officers' timeline, which shows Hall was questioned for a little over an hour and then his confession was taped from 7:06 p.m. to 7:26 p.m.

and turned it over.

Defendant Hall does not dispute that Officer Major twice read him both his state juvenile rights and adult <u>Miranda</u> rights. Hall also admits he read and signed the state juvenile rights form and the adult <u>Miranda</u> rights form but testified he did not understand them. Hall signed the statement confessing his involvement because he was scared of the officers and tried to tell them what they wanted to hear to "keep them from attacking me." Hall testified he knew what to say in his confession because the officers read Leak's statement to him four or five times.

## E. State Court's Denial of Motion to Suppress

After the witnesses testified, Hall's counsel argued to the state trial court that Hall had a right to have his father present during the questioning at the police station. The state trial court inquired whether defense counsel had "any cases that suggest that a father has the right to exercise the right to be there as a parent." Defense counsel argued that Hall's question "where is my daddy," together with Hall's father's expressed desire to be present, were sufficient to invoke Hall's right to have his father present during the questioning. Hall's counsel argued that "in the interest of justice, maybe . . . if a parent wishes to see a young kid of fifteen years of age, if the parents want to see him, if he is there for questioning, I think it would be the same thing if he asked, which he did, where is my father."

Ultimately, the state trial court determined that it was the accused's right to

assert, not the father's, and the officers had testified Hall never asked for his father. The state trial court thus denied Hall's motion to suppress.

## F. First and Second Trials

During the first trial, Hall put on an alibi defense, to wit: that at the time of the crimes, he was at home on the phone with several friends. As to his confession, Hall testified that he told the police officers what they wanted to hear because he was scared.

The jury was unable to reach a verdict on the robbery and kidnaping charges. After the first trial, Hall's counsel withdrew for health reasons and was replaced by counsel Valerie Smedley.

At the second trial, Hall renewed his same motion to suppress which the state trial court again denied. Hall again presented his alibi defense, to wit: that from approximately 3:00 p.m. until after 6:00 p.m. on the day of the crimes, he was at home on the phone with several friends.

For the first time in rebuttal, the State called Terry Spidle,[8] a records custodian for BellSouth, Hall's telephone provider. Spidle testified that for telephone subscriptions such as Hall's, BellSouth kept records of <u>outgoing</u> local

---

[8]Spidle's name also appears in the record spelled "Spidel." For the sake of consistency, we use the spelling "Spidle."

calls for eighteen months.[9]  Spidle testified that, according to BellSouth's records, neither Hall nor his friends (whom Hall claimed were on the phone) placed any outgoing telephone calls from 3:00 p.m. to 6:00 p.m. on October 15, 1999.[10]  The jury again was unable to reach a verdict.

## G.  Third Trial

In the third trial, Valerie Smedley again represented Hall.  Hall again renewed his same suppression motion, which the state trial court again denied. The State called these witnesses: (1) the four victims (Diane Jackson, Benson Rivers, Crystal Franklin, and Barbara Rush), (2) Sargeant Ronald Wilhoit, and (3) Officer Major.

The defense called: (1) Defendant Hall, (2) Joseph Grady, (3) Reginald Powell, (4) seven alibi witnesses (John Cartas, Ann Cartas, Dwayne Hall, Quinton Armstrong, Jarvis Blocton, LaQuanda Hall, and Bonnie Hall), and (5) Curtis Hall. In rebuttal, the State called: (1) Officers Grant and Major, and (2) Charles Chambers, a BellSouth records custodian.  Because Hall claims his trial attorney was ineffective, we outline the trial evidence in detail.

### 1.    Four Victims' Testimony

---

[9]BellSouth kept records of incoming local calls for only 60 days.

[10]Spidle testified that the State subpoenaed BellSouth for the records in May 2000, which was after the first trial concluded and more than 60 days (but less than eighteen months) after October 15, 1999 (the date Hall claimed the calls occurred).

The four victims recounted the crimes.

On October 15, 1999, Diane Jackson, owner of the Little People's Workshop, was working at the day care center. That evening at about 5:00 p.m. or 5:15 p.m., Barbara Rush, a parent of a child attending the center, came in to fill out paperwork. Benson Rivers came with Rush, his girlfriend.

Around 5:30 p.m., while Jackson, Rush, and Rivers were there, the last children left. Shortly thereafter, a tall black male in his late teens arrived and rang the bell. Jackson did not know him, but she later identified him as Leak. Leak asked about a child. Jackson responded that the child did not attend the center, and Leak left. Jackson saw Leak walk across the parking lot.

A few minutes later, Leak rang the doorbell again. When Jackson opened the door, Leak drew a gun. Leak came inside and told Jackson, Rush, and Rivers to empty their pockets and give him their money. Leak took Rivers' money, jewelry, and wallet. Then Leak moved the three victims into a bathroom. While he was doing so, Leak told someone to stay back. Leak was not speaking to victims Jackson, Rush, or Rivers, but to another person whom Jackson did not see and thus could not identify. Leak told the victims that he had accomplices outside.

Leak ordered Jackson to tie up Rivers and then put Rivers in a closet by himself in one of the bedrooms in the daycare center. Leak then ordered Rush to tie Jackson up with telephone cords and forced Rush and Jackson to lie down in a

16

different bedroom than where Rivers was located.

Around 6:00 p.m., Crystal Franklin, a parent of a daycare center attendee, arrived to pay her fees. Leak pointed a gun at Franklin and ordered her to lie down in the hallway. Leak then ordered Rush and Franklin into the same bedroom where Rivers was in the closet, and he ordered Franklin to tie Rush up with a telephone cord. Leak then told Franklin to go into the hallway and take her clothes off. Leak raped Franklin in the hallway.[11] Jackson heard Leak raping Franklin. Rivers heard Leak say he was going to have sex with Franklin, and then he heard Franklin saying "no, no, no" and screaming.

After raping Franklin, Leak left, returned again, and then ordered Franklin, who had tied Rush up, to take off Rush's shorts. Leak fondled Rush and put his gun inside her. Rivers heard Leak say he was going to have sex with Rush. Rush told Leak she had a disease, and he did not rape her. The other three victims all heard Rush tell Leak she had a disease. Leak then took Franklin's money and four rings that she was wearing.

Leak left the now four victims alone several times and returned periodically. Rivers testified that Leak went back and forth in the back of the daycare center, returning periodically to check on the victims, and told them that he had "other

---

[11]Jackson and Franklin testified that Franklin tied Rush up before she was raped; Rush testified that Franklin was raped before she was ordered to tie Rush up.

17

people outside." Jackson testified that Leak returned periodically and asked her questions about the daycare center, such as "if there was a key to the Coke machine or what was in these cabinets," or "what was in the lock box" on her desk. Rush also testified Leak "seemed confused[,] . . . as if he didn't know what he was doing. He would go back – he would tell us something and he would go back and tell us something again and come back and tell us something different." According to Rush, Leak "seemed just as scared as we were." During this time, Leak also asked Franklin for her keys. Shortly after he took Franklin's keys, Leak threw them back to her.

The victims testified that they thought another person was present during the robbery. Leak went into the kitchen at one point, and the victims heard cabinets opening and shutting in the kitchen. Jackson testified that the cabinets were being opened and shut too quickly for one person to be opening and closing them alone. To Franklin also, "[i]t sounded like it was more than one person" when she heard the cabinets slamming. Rivers also testified that he heard "noises like there was more than one person in there." Rush testified that she believed another person could have been present because Leak would appear before them very shortly after she heard noises at the opposite end of the daycare center, and because Rush also heard the cabinets slamming quickly.

During the robbery, Leak also told the victims he had people outside. At

18

one point, Rush heard Leak "yell[] a name like up front," as if he were asking a question, but Rush did not remember what the name was. At the time, Rush thought Leak was lying and that it was a "scare tactic." Rush testified that Leak referred to the people outside as "my boys."

One of the last times Leak returned to the victims, Leak told the victims his name was "Joseph Grady"[12] and he lived in a group home on Troy Highway. Leak said he could give them his name because no one would find him. Leak also said the last time he robbed someone he had to kill his victims. None of the victims heard Leak use Hall's name during the crimes.

After a period of time, the victims realized Leak had left. They untied each other and called the police. Franklin testified that after the incident was over, she could tell that someone had gone through the items in her car.

Jackson testified that Hall used to attend the Little People's Workshop, and that he lived directly behind the day care center. Franklin also knew Hall through a mutual friend, John Cartas, that the three of them used to go Wal-Mart together, and that Hall had enjoyed playing with Franklin's daughter.

2. Leak's Testimony

Leak pled guilty to rape and robbery charges stemming from the Little

---

[12]Joseph Grady is an actual person who testified at trial.

People's Workshop crimes but was not yet sentenced at the time of Hall's trial. Later, Leak was sentenced to life imprisonment.

Leak testified that he encountered Defendant Hall on the morning of October 15, 1999. Hall, who was an acquaintance and former classmate of Leak's, approached Leak with a proposition to get Leak into a gang. Defendant Hall told Leak that, to be admitted, Leak would need to rob the Little People's Workshop. Later that afternoon, about 4:00 p.m., Hall again approached Leak and suggested they immediately rob the day care center.

Defendant Hall gave Leak a .38 revolver and instructed Leak to enter the building, give two false names, and see how the place looked on the inside. Defendant Hall had a 9mm handgun. Leak entered and returned outside, and Hall told Leak to rob the day care center while Hall went around the side of the building.

Leak went inside, drew his gun, and had the victims tie one another up. Leak then let Defendant Hall into the building and spoke with Hall to get more directions. Franklin arrived, and Leak robbed her. Leak searched the day care center for money. Leak wanted to leave, but Hall told Leak to go back and rape Franklin. Leak did so and returned to Hall. Leak said Hall's name, and Hall said, "don't say that name." Hall told him to use the name "Joseph Grady" and to go

20

back and rape Rush.[13]  Leak went back to rape Rush, but she told him she had a disease, so he did not rape her.  Leak used the name "Joseph Grady" in front of the victims and told them that Joseph Grady lived on Troy Highway.  Leak went outside with Hall, who searched Franklin's car and then gave Franklin's keys back to Leak.  Leak went back inside for a while and threw Franklin's keys back on the ground.

Leak estimated he was at the Little People's Workshop for about an hour and fifteen minutes.  After he left, Leak gave Hall the money and guns back.  Leak kept Franklin's rings.  When Leak was arrested, he was taken to the police station, waived his rights, admitted his involvement, and told police that Defendant Hall was with him.

On cross-examination, Leak testified that the robbery was part of the initiation into the "Bloods" gang.  Leak admitted that although he said on direct that he was nervous inside the Little People's Workshop because it was the first time he had committed a robbery, Leak previously had burglarized a woman's home and attacked her with a hammer.

Leak testified he went into the kitchen only once during the robbery, and he did not go through the cabinets or drawers.  Leak said he never took the money

---

[13]It is unclear whether Hall told Leak to use the name "Joseph Grady" to refer to Hall or to refer to Leak.

from Rivers's wallet and that he took only about fifty dollars from the scene, although Rivers testified that Leak took eleven or twelve hundred dollars from his wallet.

### 3.    Sergeant Wilhoit's Testimony

Sergeant Ronald Wilhoit, a gang expert with the Montgomery Police Department, testified about general gang culture and presence in the community. Wilhoit testified that gangs were present in local schools and that a gang associate's commission of a crime made it more likely that the associate would be "blessed in," or given full membership, to the gang by the gang's senior members.

Wilhoit interviewed Defendant Hall, who said he associated with members of the "Crips" and "Folk Nation" gangs. Hall told Wilhoit that he associated with Leak and other suspected gang members. Hall also told Wilhoit that he was associated with "Mob One," a local non-traditional gang, as well as other traditional gangs.

### 4.    Officer Major's Testimony

Officer Major testified that after he examined the crime scene and took statements from the victims, he took Leak into custody and interviewed him. Leak identified Hall as his accomplice. Officer Major brought Hall to the police station, read him his state juvenile rights and adult <u>Miranda</u> rights, and questioned him.

Hall's father was waiting outside the interview room, but Officer Major did not bring him in because Hall did not ask for him, and it is the juvenile's right to have a parent present during questioning, not the father's:

> If Darryl doesn't ask for his father, his father can ask all day long. . . . It's the juvenile or the defendant's right[,] [s]o Darryl has to physically ask for his father. And at that time I would have brought his father in. . . . [H]e did not ask for his father. Because had he asked for his father, I would have told his father to come. All he had to do was ask for his father.

The audiotape of Hall's confession was played for the jury. At the beginning of his taped statement, Hall acknowledges that Officer Major already read him both his state juvenile rights and his adult <u>Miranda</u> rights, that he signed the waiver forms, and that he understood his rights. Then on the audiotape, Officer Major again reads Hall out loud his state juvenile rights, telling Hall specifically that he had the right to communicate with a parent or guardian before questioning. Hall states that he understands these rights and that he signed the waiver form. On the audiotape, Officer Major then reads Hall out loud his adult <u>Miranda</u> rights. Hall states that he understands these rights and that he signed the waiver form.

On the audiotape Hall then describes the crimes. Hall saw Leak on October 15, 1999 at around 4:00 p.m., and Hall told Leak that he had to rob the Little People's Workshop in order to get into a gang and because Hall needed the money to go to the homecoming dance that night. Hall and Leak went to the Little

23

People's Workshop.  Hall told Leak to go to the front of the building and that Hall would go to the back in order to look out.  Before the robbery, Hall gave Leak two guns Hall had gotten about two months earlier from a friend named Reginald Powell.

Leak went into the day care center two or three times and stayed in the center approximately thirty minutes each time.  While Leak was robbing the day care center, Hall walked into the center twice.  The first time, Hall only stepped into the center and then exited, but the second time he stayed for about five minutes, coming approximately three or four feet into the center.  During that time, Hall saw Leak tell Franklin to get on the ground and Franklin crying as Leak stood over her.  Hall did not see Leak rape Franklin.  Hall stated that he exited the center and did not come back in after that point.  Hall said that he heard Leak yelling at people to be quiet and "get down," and telling Franklin to "shut up."  Hall said that he did not know how many people were actually inside the center, but he thought maybe 15 or 20.  However, Hall saw only Leak and Franklin and a few others when he entered the center.  At one point, Hall stated that Leak called Hall by his first name, and Hall, in response, said the name "Joseph Grady" and stated that he lived on Troy Highway to conceal his identity.

During the taped confession, Hall also confirmed to Officer Major that Leak

24

gave him the keys to Franklin's car, and Hall went into Franklin's car, looked around, and then closed the door to the car and returned to the daycare center. Hall also stated that he knew Franklin through John Cartas, that he and Franklin were friends and he knew her well.[14]

Hall stated that after committing the crimes, Leak ran out the back door of the center and gave Hall some of the money he had stolen, and they both then ran toward their homes. Hall later met back up with Leak and gave the money back to Leak. After running away from the center, Leak gave Hall two checks. Hall initially told the officers that he had cashed checks he got from Leak at a Winn Dixie but later stated that he ripped the checks into small pieces and threw them into some water in a drainage ditch behind a Winn Dixie.

During his taped confession, Hall also stated that he told Leak to kill the people in the daycare center because they might later be witnesses against Leak and Hall.[15] Hall did not know why Leak did not kill the people in the center. Hall denied telling Leak to rape the women in the center.

Hall told the officers where he thought the two guns were located, one being near the doghouse at Leak's house, and one possibly by a ditch near Hall's house.

_____

[14]Hall said Franklin was the only person inside the day care center that he knew.

[15]During the taped statement, Officer Major referred to Leak several times as "Joseph," which Officer Major later testified was a misstatement.

According to Officer Major, the officers searched the drainage areas near Hall's house as well as the area near Leak's house and did not find the guns.

Officer Major admitted there were some inconsistencies between Defendant Hall's confession and the victims' statements. Officer Major attributed the inconsistencies to Hall and Leak perceiving things differently. Officer Major stated that Hall originally said there were twenty or thirty people in the Little People's Workshop, but when pressed on this point Hall said he did not really know how many people were there.

### 5. Defendant Hall's Testimony

At the third trial, Defendant Hall testified in his own defense. On October 15, 1999, Hall went to and returned from school with his sister LaQuanda. Hall and LaQuanda walked to pick up their two other sisters from school, and during their walk home they met one of Hall's friends, Sunkeissa Cantrell. Hall briefly encountered Leak, who said he was coming home from school. Leak said nothing else to Hall. After Hall got home, his brother Dwayne Hall arrived home a little after 4:00 p.m. Hall's mother arrived shortly after Dwayne Hall and fixed dinner.

Cantrell called Hall to talk about the homecoming dance scheduled for that night at 7:00 p.m. That afternoon, Hall also spoke on the phone with his friends Stacie Sweazer, John Cartas, Jarvis Blocton, and Quinton Armstrong. It was a

multi-way phone call, "like a three-way and four-way type." One person would hang up, put someone on hold, and call another person, with several of the friends on the phone at the same time. They were discussing arrangements for going to the dance. John Cartas said he did not know if he would go because he only had two dollars and the dance cost five, but Hall said he had eight dollars and would loan John Cartas three dollars to get into the dance.[16] John Cartas testified that Hall gave him a dollar toward his admission.

Defendant Hall and John Cartas attended the dance. They got a ride with Cartas's mother, who picked Hall up at Hall's house at about 7:15 p.m. On their way out to the dance, they saw a bunch of police cars at the Little People's Workshop. Hall spent that night at John Cartas's house.

Two days later, police officers arrived at Hall's house around 4:00 p.m. and arrested him. They took Hall to the police station. When Hall arrived, he "asked could my dad be in there. And they said don't worry about it, he's upstairs." Hall asked again, telling the officers, "I want my dad in here before y'all start questioning me. They said don't worry about it, he's upstairs again and told me to sit down and handcuffed my hand against the desk." Hall admitted he signed the

---

[16]Defendant Hall testified he got the money from his job at a local Days Inn and that he was paid the Friday before the crimes. The owner of the Days Inn, Jay Patel, testified that he last paid Hall on October 10, 1999, when he wrote Hall a check for twenty dollars. The crimes and the dance both took place on October 15, 1999.

state juvenile rights form and the adult <u>Miranda</u> form, but said he did not have a chance to read them first, and that the officers explained them to him after he signed them.

Hall admitted he made the taped statement, but said he was threatened:

[B]efore I made that statement, they kept reading [from their notes] to me over and over until I had a real understanding. But I told them it ain't me. They said why you lying. I said I ain't lying. And he had pointed at Officer Grant. Officer Grant came over and kicked the chair and said why you lying, why did you rob and rape the folks. I said I don't know what you're talking about, sir. And he kicked the chair and the handcuff got real tight on my wrist. Then he balled his fist up at me. Then I jumped. Then Officer Major he hit the table and said, you keep lying and we are going to put you in the county with no bond. There is some boys can rape you.

On cross-examination, Hall testified he left to pick up his sisters after school at about 3:00 p.m. and returned home around 4:00 p.m. Cantrell called, and he spoke to her briefly but had to stop and eat dinner at around 4:10 p.m. He ate dinner for about five minutes, and then got on a conference call with his friends Armstrong, Cartas, Blocton, and Cantrell, and later also spoke to Stacie Sweazer alone until about 5:00 p.m. Hall then got back on a conference call with Armstrong and Cartas and spoke with them until about 5:40 p.m., then took a shower and got ready for the dance.

About 6:00 p.m., Hall got on the phone with his friends again, and talked "[b]asically until the time we left." Hall got off the phone at 7:00 p.m. and left for

28

the dance around 7:15 p.m. when John Cartas arrived at Hall's house to pick him up. Hall acknowledged his testimony was different from his prior sworn testimony that he began eating and talking on the phone at 3:30 p.m. and that his mother was home when he got home with his sisters, but Hall said his present testimony was accurate. Hall stated that he told Officers Major and Grant that he did not understand his rights after they were read to him, but admitted that during the taped confession, Hall stated he understood his rights. Hall testified that, after they left the interview session to search for the guns, Officer Grant hit Hall in the mouth with a flashlight "about one time," which Hall acknowledged contradicted a previous sworn statement in which Hall claimed that Grant hit him "about four or five times." Hall claimed the previous statement must have been misheard or mistyped.

6.  Joseph Grady

Joseph Grady testified that prior to the trial, he did not know Darryl Hall and had never seen him before. Grady did know Leak, however. Grady had formerly been affiliated with the Folk Nation gang known as the Disciples and had a high-ranking position in the gang. Leak had told Grady at one point that Leak was also affiliated with the Folk gang named Disciples. On October 15, 1999, the day of the crimes at the Little People's Workshop, Grady saw Leak at school and had a

29

conversation with Leak. Grady told Leak that he was living in a group home and was planning to be at the mall that night. Grady never heard Hall's name in connection with any gang.

7.    Reginald Powell

Reginald Powell testified that he knew Hall and grew up with him. Powell was questioned by two detectives about the crimes at the Little People's Workshop. Powell did not know anything about the incident and told the detectives he did not give Hall any guns.

8.    Seven Defense Alibi Witnesses

The defense then called seven alibi witnesses: John Cartas, Ann Cartas, Dwayne Hall, Quinton Armstrong, Jarvis Blocton, LaQuanda Hall, and Bonnie Hall.

John Cartas testified that on the afternoon of October 15, 1999, he came home at around 3:00 p.m. After he came home, he immediately called Hall, and someone at Hall's house told Cartas that Hall was busy. Cartas called back about 15 to 20 minutes later and spoke to Hall for about ten or 15 minutes. Around 20 to 30 minutes later, around 4:00 p.m., Cartas got on a conference call with Hall and another friend, either Armstrong or Cantrell, which lasted for around 20 to 40 minutes.

Around 5:00 p.m., Cartas called Hall and spoke to him for about five to ten minutes. Hall again called Cartas around 5:30 p.m., and they spoke for about 20 minutes.[17] Cartas testified he again spoke to Hall by phone one last time before Cartas arrived at Hall's house at around 6:40 p.m. Cartas testified that when he found out what had happened at the Little People's Workshop and that Hall was a suspect, "I was just shocked, you know what I'm saying, because I know he couldn't have done it because he was with us. . . . And we was on the phone with him." Cartas attempted to make a statement to Officer Major after he heard about the crime, but Officer Major threatened to arrest him for lying.

When asked whether he knew anything about a group called "mob one," John Cartas testified that he and Hall, along with Quentin Armstrong, Jarvis Blocton, and Sunkeissa Cantrell, had formed a rap group called "mob boys." The only activities the group engaged in were playing video games and rapping.

Ann Cartas, Cartas's mother, testified that as soon as her son John Cartas got home that afternoon, a little after 3:00 p.m., he got on the phone with Hall and others. Ann Cartas testified she picked up the phone and listened in on her son's conversation "at least three" times – at around 3:40, 4:10, and 4:40. The first time, Ann Cartas heard only her son and Armstrong talking, but the second and third

---

[17]The telephone line on which Cartas called Hall (334-281-1870) was registered in his mother's name (Ann Cartas).

31

times, Cartas was on the phone with Hall. Ann Cartas "probably" picked up the phone at 5:10 p.m., but she could not remember whom she heard. As far as she knew, her son was on the phone nearly constantly from 3:15 p.m. until 6:00 p.m., but she was not listening on the phone the entire time. Ann Cartas picked up Hall to go to the dance at around 6:40 p.m. Ann Cartas also confirmed that her son and Hall had a "rap group" which had different names. They used a karaoke machine, and "all the kids used to come join in."

Quinton Armstrong testified that he was on the phone with Hall on the evening of October 15, 1999.[18] Armstrong called Hall and began speaking to him around 3:15 p.m. Hall said he had to go, and Armstrong called Hall again at around 4:00 p.m. and spoke for approximately five minutes. Hall called Armstrong around 4:30 p.m. Armstrong testified that "mob boys" referred to a rap group which included himself, Blocton, and Hall.

Jarvis Blocton testified that he was on the phone with Hall on the evening of October 15, 1999. Blocton called Hall sometime after Blocton arrived home from school at 3:50 p.m., and no one answered. He tried again later, and Hall answered. Blocton did not remember what exact time he spoke to Hall. Blocton went to work that night and arrived at approximately 5:30 p.m. Blocton also testified that the

---

[18]The phone number at Armstrong's home (334-284-3947) is registered in the name of his stepfather, Charles Hutchinson.

group known as "mob" was a rap group that included himself, Cartas, Armstrong, and Hall.

Dwayne Hall, Hall's brother, testified that on the evening of October 15, 1999, he joined Hall and his sisters after Hall picked the sisters up from school, and they all walked home together. Dwayne Hall did not see defendant Darryl Hall talk to anyone on the way home from their sisters' school, including Sunkeissa Cantrell. Dwayne Hall and Darryl Hall were at home from 3:36 p.m. until 6:40 p.m., when Dwayne Hall left to go to a football game. Dwayne Hall testified that their mother was already home and already had food prepared on the table when they came home. Dwayne Hall ate dinner at the table with Hall, and their mother ate in her room. Defendant Darryl Hall was on the phone during the afternoon, but Dwayne Hall did not know who he was talking to.

Hall's sister LaQuanda Hall testified that, after arriving at their bus stop after school, she and Hall went home and then left again to pick up their two little sisters from school and then walked back home with their sisters and Sunkeissa Cantrell. Along the way, Cantrell left them to go home, and LaQuanda and her siblings continued to walk until they met their older brother Dwayne Hall. Their mother got home just after they arrived, and the food was not yet prepared. LaQuanda testified that Hall did not leave the house again until 7:20, when he left for the

33

dance with John Cartas and Ann Cartas.

Bonnie Hall, Hall's mother, testified that on October 15, 1999, she came home around 4:00 p.m. and prepared dinner for her children. She ate dinner alone in her bedroom. Hall remained at the house from the time she got home until he left for the dance at 7:15 p.m. or 7:20 p.m. Hall was on the phone in his room.

9.   Curtis Hall

Hall's father, Curtis Hall, testified regarding Hall's arrest and the ensuing police search conducted in the house and backyard. Curtis Hall testified that his son was not involved with gangs and that he had perfect school attendance. Hall had only one discipline problem at school when Hall was "running off at the mouth."

10.   State's Rebuttal

In rebuttal, the State called Officers Grant and Major. Officer Grant denied striking Hall or kicking his chair. Officer Major testified that during Hall's questioning, Hall never stated he was on the phone with anyone at the time the crimes occurred. Hall initially said he did not do it, and then later he confessed. Officer Major did not believe Hall's alibi because after Hall had confessed and was leading the officers to search for the guns later that same evening, the police and Hall went by Hall's house and Hall's mother "ran to [the police car in which Hall

34

was sitting] and said don't say anything else[,] you was on the telephone. Then John [Cartas] came in a couple of days later telling us that he was on the phone with [Hall]. . . And [Cartas] told me that [Hall]'s parents told him to come down there." Officer Major denied reading Leak's statement to Hall before Hall confessed and said Leak's statement had not even been transcribed yet at that time. Officer Major denied threatening Hall.

The State also called Charles Chambers, a records custodian for BellSouth. Chambers testified that his department handles subpoenas for records from BellSouth. Chambers testified that "incoming call[] daily information" is kept for about 60 days, while outgoing call information is kept "longer than that, somewhere in the range of eighteen months or so," for "billing purposes" in case of discrepancies and complaints. Chambers made no distinction between records kept for local calls and records kept for long distance calls.[19]

Chambers testified that BellSouth received several subpoenas for call records in connection with Hall's trial. First, BellSouth was subpoenaed on May 9, 2000 for the records in reference to Bonnie Hall's telephone account (334-284-

_____

[19]As we note later in this opinion, it was later revealed that neither Spidle's testimony during the second trial nor Chambers' testimony during the third trial was factually accurate as to the retention period for records of local outgoing calls. In fact, for regular, "non-measured" customers, BellSouth retained records of outgoing local call records for only 60 days, not 18 months as Chambers and Spidle testified at trial.

35

1968).  The subpoena "requested information on incoming and outgoing calls" on October 15, 1999.  Chambers testified that he could not say whether there were incoming calls to the account on October 15, 1999, because at the time the subpoena was received there were no longer any records of those calls.  Chambers testified that as for outgoing calls, "[b]ased upon our records, there were no outgoing calls found" between 4:00 p.m. and 6:00 p.m. on October 15, 1999 from the Hall residence and, therefore, there were no calls between 4:00 p.m. and 6:00 p.m. from Hall to Ann Cartas's line or Charles Hutchinson's line.

Chambers testified that BellSouth also received a subpoena "for all phone records including incoming and outgoing [calls]" for Ann Cartas' account (334-281-1870) on October 15, 1999.  Chambers again testified there were no records available of incoming calls for that date.  Chambers testified that there were no outgoing calls from the Cartas home on the 15th:

> Q.    Let's talk about the outgoing calls from the Cartas home on the 15th.  Was there an outgoing call for 281-1870 between the hours of four p.m. and six p.m.?
> A.    No.
> Q.    There was no phone call from the Cartas home to the telephone number of Darryl Hall 284-1968 between four and six p.m.; is that correct?
> A.    That is correct.

Chambers also testified as to BellSouth's response to a subpoena for records in connection with the account of Charles Hutchinson, at the home of Quinton

Armstrong. That subpoena requested "[a]ny and all phone records including incoming and outgoing calls to phone number 334-284-3947 on the date of 10-15-99." Chambers testified that as to Hutchinson's account, there were "some . . . outgoing calls on October 15th," but there were no outgoing calls from Hutchinson's home to Hall's home. Chambers testified that, as with the other accounts, there was no information available as to any incoming calls for the Hutchinson account.

On cross-examination, Chambers clarified that he was referring to both local and long distance calls when he said "outgoing calls." Chambers further testified that outgoing call records were kept for all customers with any type of service, even those who are not billed specifically for outgoing calls. On cross-examination of Chambers, Hall's trial counsel Smedley pointed out that Chambers was saying there were no records of any outgoing calls, from any of the multiple accounts at issue, <u>for the entire day</u> of October 15, 1999:[20]

> Q. So what you're saying is that for October 15th for an entire day that no calls were made from each of those residences?
> A. No, I am not saying that. I am saying we have no record of those – of any calls for those days.
> Q. But if you have no record for those calls and you say you keep up with the calls and your letter says that no calls were found for October

---

[20]Chambers later clarified on redirect and cross-examination that there were three outgoing phone calls shown on Hutchinson's account for October 15, 1999, all of which were long distance calls.

37

15th of 1999, are you not saying that nobody made a phone call?

A     Are you talking about incoming or outgoing calls?

Q.    Either.

A.    If the records do not find the information, yes, I would say that information is not there for that period for that day, yes.

Q.    So for a whole day on October 15th of 1999, out of all those subpoenas that [the State's attorney] went over with you, nobody from any of those homes picked up their phone and made a phone call at all that whole day?

A.    Our records show no outgoing calls for those dates.

Q.    Okay.  Would your records show if numbers had been disconnected?

A.    If the telephone number had been disconnected?

Q.    Yes.

A.    Yes.

Q.    So all of these people would have active service, and nobody made a call at all?  Nobody picked up their phone to call anyone from twelve o'clock –

. . .

Q.    From twelve o'clock a.m. to – or twelve o'clock midnight, that's when October 15 would start, until 11:59 that night, nobody picked up their phone from any of those residences and made a phone call?  Is that what you're saying?

A.    I am saying that our data shows no outgoing calls were made on that date, yes.

Q.    That's whether you have measured service or local service or any kind of service?

A.    Yes.

11.    <u>Jury's Verdict</u>

The jury at the third trial found Hall guilty of all charges.[21]  On March 1, 2001, the state trial court sentenced Hall to concurrent terms of life imprisonment

---

[21]Hall was acquitted during the first trial of rape and sexual abuse charges, so in the second and third trials he was charged only with the robbery and kidnaping crimes.

for the Class A felonies (robbery) and twenty years' imprisonment on the Class B

felonies (kidnaping).[22]  On March 8, 2001, Hall appealed.  On that same day,

Smedley withdrew as Hall's counsel.

## H.    Motion for New Trial

Hall retained Thomas M. Goggans as counsel.  On April 2, 2001, Goggans

filed Hall's motion for acquittal, or, in the alternative, a motion for new trial.[23]

Hall argued, <u>inter alia</u>, that his confession was not voluntary and that trial counsel

Smedley was ineffective.  Hall argued that at his third trial Smedley failed to

present sufficient evidence: (1) in support of Hall's alibi, such as by failing to call

four alibi witnesses who had testified in Hall's first trial: Pamela Armstrong,[24]

Sunkeissa Cantrell,[25] Gloria McElroy,[26] and Lea Dettmar,[27] and (2) of Hall's good

---

[22]For robbery, Alabama law authorizes a sentence of between 10 years and 99 years or life.  <u>See</u> Ala. Code §§ 13A-5-6(a)(1); 13A-8-41(c).  For second-degree kidnaping, Alabama law authorizes a sentence of not more than 20 years and not less than 2 years.  <u>See</u> Ala. Code §§ 13A-5-6(a)(2), 13A-6-44(c).

[23]Since 2001, Goggans has remained Hall's counsel, including throughout direct appeal in state court and the federal § 2254 proceedings.

[24]According to Pamela Armstrong, her son Quentin Armstrong was on the phone with Hall and others during the afternoon of October 15, and they made several calls back and forth up until the time she took her son to the dance at 6:45 p.m.  Pamela herself talked with Hall on the phone that day at approximately 3:15 p.m. or 3:30 p.m.

[25]On October 15, 1999, Sunkeissa Cantrell arrived home from school at about 3:00 p.m. She saw Hall walking on the way back from picking up his sisters at around 3:00 p.m. or 3:10 p.m.  Cantrell did not see Hall talk with anyone else while walking.  From her cousins' home, Cantrell called Hall around 3:20 p.m., and they discussed the dance that night.  They were on the phone for about 20 minutes.  Cantrell called Hall again around 4:30, and had a four-way conversation with Hall, Quinton Armstrong, and John Cartas.  Cantrell talked with Hall several

character by failing to call three character witnesses who had testified at Hall's first trial: Linda Dowe, Gregory Dowe, and Katherine Scott.[28]

On April 24, 2001, Hall filed an addendum to his motion for new trial alleging, <u>inter alia</u>, that Chambers's testimony was incorrect in that BellSouth did not keep <u>outgoing</u> call records for eighteen months. In fact, Hall argued, BellSouth maintained outgoing local call records for the accounts for only 60 days after the date of the calls, and because no subpoena was issued within the 60-day time period after the calls, BellSouth would have deleted records of all local calls to and from the involved telephones by the time the records were subpoenaed. Hall contended that evidence of the falsity of Chambers's testimony was available from

---

times that evening. Cantrell and Hall had a rap group called "Mob," which did not require anyone to do anything to get into the group other than rap. Cantrell testified that Hall was not in a gang.

[26]Gloria McElroy is Sunkeissa Cantrell's mother and testified her daughter was on the phone with Hall off and on from 4:15 p.m. or 4:30 p.m. up until 6:00 p.m. or 6:30 p.m. on October 15, 1999. Gloria McElroy did not testify that she or her daughter were at their cousins' home that evening. Gloria McElroy is also referred to in the record as "Gloria McElroy Abdul Khaliq" or simply "Gloria Khaliq." For the sake of consistency, we refer to her throughout this opinion as "Gloria McElroy."

[27]Lea Dettmar is a teacher at Hall's school, and Hall was in her world history class. Dettmar testified that Hall was in school on October 15, 1999 and that school starts at 7:45 a.m. Attendance records in support of her testimony were admitted at the first trial.

[28]Linda Dowe and Gregory Dowe testified that they lived in Hall's neighborhood, they knew Hall for eight years, Hall had a "good" reputation, and they had never had any problems with Hall. Katherine Scott testified that she was Hall's neighbor for four and a half years and she knew Hall and his parents. Hall and his siblings were a "sweet bunch of children," and she taught them Bible stories. Scott never knew Hall to do anything wrong, he had a very good reputation for truth, and he was a "good child."

BellSouth and "from persons connected to the involved telephones," but that Smedley did not present it.

Hall further argued that he lacked the capacity to waive his state juvenile rights at the time he made the statements to police because "psychological or psychometric" testimony showed Hall lacked the capacity to resist the pressures put upon him. His first counsel, Bell, did not have Hall tested or present such evidence in support of having Hall's statements suppressed. Hall's counsel did not seek to reopen the suppression hearing.[29]

## I.     State Court Hearing on Motion for New Trial

On April 25, 2001, the state trial court conducted a hearing on the new trial motion. At the hearing, Goggans and attorney Elizabeth Addison represented Hall. Linda Taffett, an education expert, testified that she administered academic testing to Hall approximately a week prior to the hearing. Hall was seventeen years and five months old at that time.

According to Taffett, Hall had a "very difficult time following instructions." When he read independently, his reading comprehension was at the third grade, fifth month level. Reading with Taffett, his reading comprehension level was at the fourth grade, second month level. Hall scored at the lowest level possible on a

---

[29]For this claim, Hall does not specify whether he is referring to Smedley, Bell, or both.

41

picture vocabulary test, and his learning ability was at the level of an eight-year-and-seven-month-old child in the fourth grade. On an oral reading test, his reading rate was at the fifth grade, first month level, and his accuracy rate was at the fifth grade, fifth month level. Taffett opined that Hall did not have the intellectual ability to "mastermind or be the leader of any type of crime or to even orchestrate this type of crime, any crime."

Smedley, Hall's trial counsel, also testified. Smedley did not feel that she had enough experience to handle Hall's case.[30] Prior to trial, Smedley did not interview Chambers, Pamela Armstrong, or Gloria McElroy. Smedley believed that Ms. Cantrell had moved and she "didn't have the opportunity to find her." During the third trial, Smedley put on all the witnesses she thought would help support her theory of the case, and she made those decisions based on her theory of the case and her discussions with Hall, his family, and the witnesses.

Vickie Price, one of Hall's teachers, testified that she never had any "serious" problems with Hall, that he was not in a gang, and that he did not have any "leadership qualities." Another witness, Tyrone Anderson, a probation officer with the Montgomery Youth Facility, worked with Hall in a "predispositional"

---

[30]At the time Smedley represented Hall, she had been practicing law for four years. Prior to her representation of Hall, she had tried two to three criminal trials involving theft of property, but no trials involving "major" crimes such as rape, kidnaping, or robbery.

42

capacity after Hall was arrested and prior to his trial. In gathering information for a predisposition report, Anderson talked to people in the community and at Hall's school. Anderson ultimately recommended to the juvenile court that Hall be allowed to go home because he was not a threat to anyone.

Three alibi witnesses from the first trial, Gloria McElroy, Sunkeissa Cantrell, and Pamela Armstrong, testified that they would have given the same testimony in the third trial that they gave in the first trial if they had been called to testify.

A juror from the third trial, Letricia Long, testified that there was "quite a lot of confusion" during deliberations about the evidence of telephone calls. Long testified that the evidence at trial "made it look like it wasn't any phone calls going out or coming in" on the day of the crime, implying that Hall was guilty. However, the juror also testified that "nobody actually believed" Chambers's testimony because he said there were not any incoming or outgoing calls at all that day:

> It was quite a lot of confusion about it, because it wasn't any incoming or outgoing calls, and it was a major issue in different homes with teenagers and that there weren't any phone calls made, and nobody actually believed it.

Later, on cross-examination, the juror testified that the majority of jurors did not believe the testimony of Chambers, but still found Hall guilty.

43

Kathleen Mahoney, the BellSouth supervisor of subpoena compliance at the BellSouth Subpoena Compliance Center, testified by telephone. Mahoney testified that in October of 1999, for a regular "non-measured service customer,"[31] outgoing long-distance calls would be billed to the customer and would appear on their bill, but records of incoming and outgoing <u>local</u> calls would be kept for only 60 days. After 60 days, the records of all of the local calls would be erased. Mahoney explained, "We do not keep local calls because there is no billing on them for a regular non-measured customer." However, Mahoney testified that if a customer has local "measured" service and also asks to have their local measured service calls printed on their telephone bills, the records of incoming and outgoing local calls are kept for 18 months. Curtis Hall and Anne Cartas both testified that on the day of the crimes, they had only basic telephone service rather than "measured" service.

Hall also filed a copy of one of the subpoenas served on BellSouth for phone records and BellSouth's response. The subpoena was issued May 10, 2000. The subpoena requested the production of the following documents:

> Any and all phone records, including incoming and outgoing calls for phone number (334) 281-1870 on the date of 10/15/99. The account

---

[31]Mahoney testified that "non-measured service" is a "special billing plan that . . . customers can subscribe to. . . . The bill is sent on the usage of the customer."

44

holder's name is Anne Cartas of 360 Eagerton Rd., Montgomery, AL 36116.

In response to the subpoena, the BellSouth Compliance Assistant, Patricia Tapp, returned an affidavit dated May 16, 2000 stating, "No records as described in the legal document are available" and signed a letter to the Circuit Court of Montgomery County, also dated May 16, 2000, stating in part:

> There were no calls found for the date that you provided. Incoming calls are only available for approximately sixty days prior to the current date. There were no outgoing calls found.

BellSouth also submitted Chambers's and Spidle's affidavits, in which they stated it was their understanding at the time they testified at trial that BellSouth kept local outgoing call information for the subject accounts for a period of eighteen months. Both Chambers and Spidle had since learned that, in fact, records of outgoing local calls in connection with the involved accounts were kept for a period of only 60 days. BellSouth also submitted the affidavit of James L. Preau, the Director of Security at BellSouth. Preau reviewed the five subpoenas served upon BellSouth for Hall's trial and concluded that the accounts for which the subpoenas sought records were all "flat rate" accounts, meaning that the customers had not elected "measured" service and that there would have been no data on local incoming or outgoing calls at BellSouth when BellSouth received the subpoenas in June and July of 2000, before the second trial began in November of

45

2000.

**J.     State Court's Order Denying Motion For New Trial**

The state trial court denied Hall's motion for a new trial. In its order, the state court acknowledged that Taffett's tests revealed that Hall was in the "low intelligence segment of the population." As to Hall's challenge to his confession, the state court stated that it had already considered Hall's intelligence and age in its ruling on Hall's motion to suppress and at trial and that this did not render his confession inadmissible:

> Matters of the defendant's intelligence and age were considered fully at the hearing on the motion to suppress and throughout each of the trials. While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.

As to the ineffective-trial-counsel claim, the state trial court found that Dettmar's testimony as to Hall's alibi defense of being in school would have been cumulative of other evidence presented at trial, including the admission of school records showing attendance, and that it would not have been pertinent given that the crimes occurred after school hours. The state trial court further found that additional alibi witnesses would have been cumulative of the evidence presented at trial through the alibi witnesses "Daryl [sic] Hall . . . , John Cartas, Ann Cartas,

46

Jarvis Blockton [sic], and Quinton Armstrong."[32]  The state trial court dismissed the remaining claims of ineffective assistance that were based in Smedley's lack of experience, being overworked, and lack of time.

The state trial court acknowledged Hall's argument that the jury was left with a false impression regarding the existence of phone records at BellSouth for the day of the crimes and that the two BellSouth witnesses who testified at Hall's second and third trials had since filed affidavits stating that their trial testimony was in error.  Quoting the trial transcript, the state court stated, "testimony from the trial did not indicate there were no calls, but [rather that] 'we have no record of those--any calls for those days'" (emphasis added).  Furthermore, the state court found that the juror who testified at the hearing made it clear that the jury had ignored the evidence of the phone records during its deliberations.  Therefore, Hall's claim that the BellSouth evidence left a false impression with the jury was moot.

The state trial court found that the other grounds on which Hall had sought a

_____

[32]In referring to "Daryl Hall," it appears that the state trial court was referring to Dwayne Hall, the defendant's brother, who testified at trial that he and Hall walked home from school together on the day of the crimes.  In addition to the alibi witnesses named in the trial court's order, Bonnie Hall and LaQuanda Hall testified at trial as to Hall's alleged whereabouts on the day of the crimes.
Reginald Powell did not testify as an alibi witness despite being named as one by the state trial court.

new trial were meritless.

**K.     Direct Appeal: Alabama Court of Criminal Appeals**

Hall appealed his convictions to the Alabama Court of Criminal Appeals, which affirmed.  Hall v. State of Alabama, No. CR-00-1180, slip op. (Ala. Crim. App. Oct. 18, 2002) (unpublished).[33] The Alabama appeals court addressed three issues: (1) whether Hall was due a new trial due to Chambers's false testimony, (2) whether the trial court erred in denying his motion to suppress, and (3) whether Hall received ineffective trial counsel.

As to Chambers's false testimony, the Alabama appeals court noted that the record was silent as to whether the error in Chambers's phone record testimony could have been discovered before or during the second and third trials by the exercise of due diligence.  The Alabama appeals court also observed that the trial court had made an "implicit finding that there was not a 'significant chance' that had the jury heard the correct information, it would have reached a different result," and that, based upon the record, the Alabama appeals court could not conclude that this finding was clearly erroneous.  Id. at 4-5.

Second, the Alabama appeals court concluded that the trial court did not err

---

[33]The Alabama criminal appeals court denied Hall's motion for rehearing on November 15, 2002.

in denying Hall's motion to suppress his confession, as the record indicated that Hall admitted he received both his state juvenile warnings and his adult Miranda warnings, understood all of his rights, waived his rights, and spoke with the officers. The appeals court noted that Hall testified that he had asked for his father's presence prior to making his statement, but the officers testified that he had not. The appeals court stated, "[t]he evidence offered by the appellant conflicted with that offered by the State and, therefore, created a question of fact for the trial court. It is well settled that the trial court's finding of voluntariness of a confession need only be supported by a preponderance of the evidence[,] and will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence." Id. at 7 (citations and quotation marks omitted).

Finally, the Alabama appeals court recounted the findings of the trial court as to Hall's claims of ineffective trial counsel and concluded, without discussion, that these claims did not require reversal under the standard set out in Strickland v. Washington, 466 U.S. 668, 693-94, 104 S. Ct. 2052, 2067-68 (1984).

## L.    Direct Appeal:  Alabama Supreme Court

The Supreme Court of Alabama granted Hall's petition for a writ of certiorari in part and affirmed the judgment of the Alabama appeals court. Ex parte Hall, 863 So.2d 1079, 1081 (Ala. 2003).  The Alabama Supreme Court

reviewed two issues: (1) whether the trial court's denial of Hall's motion for acquittal or new trial, which was based on claims of perjured testimony and ineffective trial counsel, was proper; and (2) whether Hall's confession was voluntary and properly admitted into evidence. Id. As to the false testimony of Chambers, the Alabama Supreme Court, applying Ex parte Frazier, 562 So.2d 560 (Ala. 1990),[34] agreed with the trial court's ruling that the outcome of the trial would not have been different had the jury heard the correct facts regarding the telephone records. Id. at 1083. The Alabama Supreme Court also concluded that Hall failed to exercise "due diligence" in discovering the falsity of the BellSouth testimony, given that "Hall had every opportunity to evaluate Chambers's testimony before the start of the third trial. . . ." Id. Under Ex parte Frazier, the exercise of due diligence is an element of the test for whether a new trial should be granted due to perjured testimony. 562 So.2d at 569-70.

As to Hall's ineffective trial counsel claim, the Alabama Supreme Court granted Hall's certiorari petition only as to whether a defendant not entitled to a

---

[34]In Ex parte Frazier, the Alabama Supreme Court adopted the standard to be used in non-death-penalty cases where perjured testimony is the basis for a motion for new trial. In such cases, a new trial should be granted only where the trial court is "reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the evidence tending to prove the witness's perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of due diligence." 562 So.2d at 569-70.

new trial under Frazier—because his trial counsel failed to exercise due diligence in finding false testimony—is entitled to a new trial because trial counsel was ineffective. The Alabama Supreme Court concluded that even if Smedley's failure to discover the falsity of Chambers's testimony was error, the second prong of the Strickland test[35] was not satisfied because the court already had concluded that, under Frazier, there was not a significant chance that the jury would have reached a different result had it heard the truth. Id. at 1084-85. The Alabama Supreme Court made no ruling, therefore, on whether Smedley's failure to exercise due diligence in discovering the falsity of Chambers's testimony amounted to ineffective assistance. Nor did it rule on Hall's other claims of ineffective assistance, as it did not grant certiorari as to those claims.

As for Hall's claim that his confession was involuntary, the Alabama Supreme Court: (1) observed that Hall and the State presented conflicting evidence as to whether Hall had asked for his father to be present prior to being questioned, creating a question of fact for the trial court to resolve, and (2) found no reason to hold that the trial court's determination that the confession was voluntary was

---

[35]In Strickland, the Supreme Court held that a defendant complaining of ineffective assistance of counsel must satisfy two requirements. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S. Ct. at 2064. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.

51

contrary to the weight of the evidence. Id. at 1087.[36]

## M.     Federal Section 2254 Petition

On March 30, 2004, Hall filed a petition for habeas corpus under 28 U.S.C. § 2254 in federal district court. Hall's petition claimed that (1) his confession was involuntary and in violation of Miranda, and (2) he received ineffective trial counsel.[37]

As for his ineffective trial counsel claim, Hall argued that Smedley (1) was not experienced enough to handle Hall's case, (2) did not request funding for an expert or investigator, (3) did not interview anyone with BellSouth regarding the records of outgoing calls, (4) did not present character witnesses, (5) failed to call Pamela Armstrong, Sunkeissa Cantrell, and Gloria McElroy as alibi witnesses, and (6) presented no evidence of Hall's "mental status," specifically Taffett's opinions that Hall lacked the intellectual ability to mastermind or orchestrate any type of crime.

The magistrate judge's report recommended denial of the § 2254 petition as to both Hall's ineffective counsel claim and his involuntary confession claim

---

[36]Hall did not seek state post-conviction relief.

[37]On appeal, Hall does not challenge his life sentence or assert an Eighth Amendment claim that this sentence is unconstitutional "cruel and unusual punishment." Hall's sentence is subject to parole, which may explain why he does not raise an Eighth Amendment challenge.

52

because the Alabama Supreme Court's decision affirming the trial court judgment was not contrary to or an unreasonable application of federal law, nor was it an unreasonable determination of the facts. Overruling Hall's objections, the district court adopted the magistrate judge's report and denied Hall's § 2254 petition. The district court granted Hall a certificate of appealability ("COA") on (1) his involuntary confession claim and (2) his ineffective trial counsel claim.

## II. STANDARD OF REVIEW

Pursuant to § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief to a state prisoner

> unless a state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the relevant state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) (quoting 28 U.S.C. § 2254(d)(1), (d)(2)) (citations omitted). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Id.

"We review de novo the district court's decision about whether the state

53

court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1332 (11th Cir. 2009). Thus, under AEDPA we review the district court's denial of Hall's § 2254 petition de novo, but we "owe deference to the final state habeas judgment." Peterka v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008), cert. denied, 129 S. Ct. 1039 (2009).

### III. HALL'S MIRANDA WAIVER AND CONFESSION

Hall argues that his waiver and confession were not knowing and voluntary and should have been suppressed. We first review the general principles governing Miranda warnings in the juvenile context and then Hall's confession claims.

Under Miranda, "the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." Fare v. Michael C., 442 U.S. 707, 717, 99 S. Ct. 2560, 2568 (1979) (juvenile case) (citing Miranda v. Arizona, 384 U.S. 436, 473, 86 S. Ct. 1602, 1627 (1966)). If a defendant unambiguously requests for counsel or to remain silent, police must cease interrogation. Berghuis v. Thompkins, – S. Ct. –, No. 08-1470, 2010 WL 2160784, at *8-9 (Jun. 1, 2010) (concluding defendant's silence during two-hour-and-45-minute interrogation did not invoke right to remain silent or right to counsel because defendant must make "an

54

unambiguous" request to invoke his Miranda rights); Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (concluding if accused makes a statement concerning right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation).

The government cannot introduce a suspect's statement taken without the presence of an attorney without first showing that the suspect made a voluntary, knowing, and intelligent waiver of his Miranda rights. Hart v. Att'y Gen. of Florida, 323 F.3d 884, 891 (11th Cir. 2003) (citing Miranda, 384 U.S. at 475, 86 S. Ct. at 1628). The government bears a "heavy burden" to demonstrate that the waiver was voluntary, knowing and intelligent. Id. The Supreme Court has "stated that this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence." Thompkins, 2010 WL 2160784, at *10 (quoting Colorado v. Connelly, 479 U.S. 157, 168, 107 S. Ct. 515, 522 (1986)). The prosecution "does not need to show that a waiver of Miranda rights was express," and "an implicit waiver" of the Miranda rights is sufficient. Thompkins, 2010 WL 2160784, at *10; accord North Carolina v. Butler, 441 U.S. 369, 373, 375-76, 99 S. Ct. 1755, 1758-59 (1979).

The inquiry into whether a waiver was voluntary, knowing, and intelligent is twofold, or, stated another way, "has two distinct dimensions." Moran v. Burbine,

55

475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986). First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id.; accord Hart, 323 F.3d at 892 (quoting Burbine, 475 U.S. at 421, 106 S. Ct. at 1141). Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Hart, 323 F.3d at 892 (quoting Burbine, 475 U.S. at 421, 106 S. Ct. at 1141). Even if a defendant's statement is voluntary and not coerced, the "prosecution must make the additional showing that the accused understood these [Miranda] rights." Thompkins, 2010 WL 2160784, at *11; see Burbine, 475 U.S. at 421-22, 106 S. Ct. 1141.

The Supreme Court utilizes a totality-of-the-circumstances approach to ascertain whether a juvenile's waiver of Miranda rights and confession were voluntary, knowing, and intelligent. See Fare, 442 U.S. at 725, 99 S. Ct. at 2572 (stating "[t]he totality approach permits–indeed, it mandates–inquiry into all the circumstances surrounding the interrogation"). The "totality approach" includes "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id.; accord Coleman v. Singletary, 30 F.3d 1420, 1426 (11th Cir.

56

1994).

The Supreme Court has warned that "admissions and confessions of juveniles require special caution." In re Gault, 387 U.S. 1, 45, 87 S. Ct. 1428, 1453 (1967). In cases where a juvenile is involved, "[i]f counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." Id. at 55, 87 S. Ct. at 1458. "[W]hen . . . a mere child – an easy victim of the law – is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity." Haley v. Ohio, 332 U.S. 596, 599, 68 S. Ct. 302, 303-304 (1948).

The Supreme Court has held waivers and confessions involuntary where a young defendant was isolated or interrogated intensely for long periods of time or overnight without the presence of a guardian or counsel. In Haley, for example, the Supreme Court concluded that where a 15-year-old boy was questioned "hour after hour" without the presence of a friend or an attorney for five hours, in the "dead of night" from midnight to 5 a.m., by five or six police officers acting in relay teams of one or two each, his confession was involuntary. Haley, 332 U.S. at

57

598-601, 68 S. Ct. at 303-304.

Similarly, the Supreme Court has held that the written confession of a 14-year-old defendant was inadmissible where the written confession was obtained after the defendant "had been held for five days during which time he saw no lawyer, parent or other friendly adult," even though there was no evidence of prolonged questioning by officers. Gallegos v. Colorado, 370 U.S. 49, 50, 53-54, 82 S. Ct. 1209, 1210, 1212 (1962). In Gallegos, the Supreme Court cited these factors in concluding the 14-year-old's confession was involuntary: "[t]he youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, [and] the failure to see to it that he had the advice of a lawyer or friend . . . ." Id. at 55, 82 S. Ct. at 1213.

On the other hand, the Supreme Court has held a juvenile's waiver and confession were knowing and voluntary where the circumstances indicate that the juvenile fully understood his rights and was not coerced into waiving them or making a confession by long periods of interrogation or other pressure tactics. In Fare, for instance, the Supreme Court held that a 16-and-1/2-year-old defendant voluntarily and knowingly waived his Fifth Amendment rights despite the fact that he requested to see his probation officer during questioning. 442 U.S. at 726, 99 S.

Ct. at 2572.  The officers explained his <u>Miranda</u> rights to him and there was no indication at that time that he did not understand them.  <u>Id.</u>  After his request to see his probation officer was denied and after the <u>Fare</u> juvenile defendant was informed of his rights a second time, he agreed to waive his rights and continue the interrogation.  <u>Id.</u>  The Supreme Court noted that the defendant had "considerable experience with the police," several arrests, and had been on probation for several years.  <u>Id.</u> at 726-27, 99 S. Ct. at 2572-73.  The defendant "was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit."  <u>Id.</u>

Similarly, this Court has held that a 17-year-old defendant's confession was knowing and voluntary where the defendant "had a substantial history of involvement in the Juvenile Justice System and, in fact, was a run-away from a state facility."  <u>United States v. Kerr</u>, 120 F.3d 239, 241 (11th Cir. 1997).  In <u>Kerr</u>, the defendant was read his state juvenile rights from a juvenile waiver of rights form, read the form himself, and then signed it before confessing to the crime.  <u>Id.</u> at 241-42.  Another officer then gave the defendant his adult <u>Miranda</u> warnings before recording the defendant's statement.  <u>Id.</u> at 241.  The defendant never asked for an attorney or a guardian and did not allege that he was mistreated or coerced

into making a confession.[38]  Id. at 242.

In addition, in Paxton v. Jarvis, 735 F.2d 1306, 1308-10 (11th Cir. 1984),

this Court concluded that the juvenile defendant's confession was knowing and

voluntary where he was one month shy of his sixteenth birthday, was questioned

from 8:30 p.m. until 4:30 a.m., and was told of the charges against him, and was

twice given Miranda warnings.  Id. at 1308-09.  The defendant's mother was

present until 12:30 a.m., during which time the defendant admitted breaking into

the victim's home with two other boys but denied raping and murdering the victim

and stated he left the home before any harm was done.  The defendant's mother

then left the police station at 12:30 a.m.; the officers continued the questioning,

and, at 4:27 a.m., the defendant signed a statement incriminating himself in the

rape and murder.  Although the defendant and his mother claimed the police had

not read all of the Miranda rights, had yelled at the defendant, threatened physical

---

[38]In Kerr, the defendant specifically argued, inter alia, that his confessions should be suppressed under 18 U.S.C. § 5033.  Kerr, 120 F.3d at 241.  Section 5033 requires that, whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer advise the juvenile of his rights and notify the parents, guardian, or custodian of the juvenile that the juvenile is in custody, the rights of the juvenile and the nature of the alleged offense.  18 U.S.C. § 5033.  We stated in Kerr that "[w]hile § 5033 requires urgency in the notification of a parent or guardian, there is no requirement that a parent be present in order for a juvenile's statement to be admissible."  120 F.3d at 241 (emphasis added).  We then analyzed the voluntariness of the defendant's confession based on the totality of the circumstances, finding it admissible.  Id. at 241-42.

Hall raised no argument in his § 2254 petition or on appeal that 18 U.S.C. § 5033 applies to his case.

harm to the defendant, had beat him, and had tried to intimidate him by alluding to the electric chair, the police denied all of these allegations in a hearing before the state trial court. Id. at 1309. In his § 2254 petition, the defendant claimed his confession to the rape and murder was involuntary. This Court affirmed the district court's denial of the defendant's § 2254 petition, noting the entire record was before the state court which found defendant's confessions were voluntary and the record amply supported that finding. Id. at 1309-10. In affirming, this Court found significant that the defendant was almost sixteen years old, he had "ample contact" with family members at the station, he was told of the charges and given Miranda warnings and "the questioning, although extending over most of the night, was neither continuous nor conducted by use of threats or beatings." Id. at 1310.

Even where a juvenile defendant has a lower-than-average intelligence or reading level, his waiver and confession may still be knowing, intelligent, and voluntary if the totality of the circumstances indicate that he understood his rights when he waived them. See Henyard v. McDonough, 459 F.3d 1217, 1241 (11th Cir. 2006). In Henyard, this Court concluded that an 18-year-old defendant's confession was voluntary and the defendant understood his rights where: (1) the police explained his rights to him twice, and he waived them twice, (2) his intelligence, "although below average, was not so low that he could not understand

his rights," (3) the transcript of the interrogation revealed no indication that defendant was confused or misunderstood the seriousness of the interrogation, (4) the police did not engage in any trickery, deception, or improper interrogation tactics, and (5) the defendant had previous experience with the justice system. Henyard, 459 F.3d at 1241.

Likewise, in Rogers v. Quarterman, 555 F.3d 483 (5th Cir.), cert. denied, 130 S. Ct. 365 (2009), the Fifth Circuit concluded that a 15-year-old's confession was knowing and voluntary where he was read his Miranda rights twice, and both times confirmed that he understood those rights. Id. at 485, 494-95. He was not subjected to any physical abuse or trickery. Id. at 495. The Fifth Circuit noted that the petitioner could read only at a third or fourth grade level and was a "slow learner" with a low IQ. Id. at 493. But the court also noted (1) the petitioner "was in the eighth grade passing all his classes" and "was not mentally retarded," (2) the magistrate judge who took his statement testified that the petitioner read it aloud and read it well, and (3) the petitioner was alert, well-oriented, and able to communicate ideas without difficulty. Id. Although the 15-year-old petitioner in Rogers had no prior experience with the criminal justice system and functioned at an intellectually younger age, the Fifth Circuit also noted that he "was not continuously or lengthily interrogated, [] was detained for a period of hours rather

62

than days . . . [,] was continuously apprised of his rights, and while he may have functioned at a younger age intellectually, the record indicated he understood those rights." Id. at 495.

We now apply these principles to Hall's case.

## IV. HALL'S CONFESSION

The totality of the circumstances here indicates that Hall's waiver of his Miranda rights and his subsequent confession were knowing, intelligent, and voluntary. As in Henyard and Rogers, the officers continually read Hall his state juvenile rights (twice) and his adult Miranda rights (twice). Thus, four times Hall was told that he had a right to remain silent and a right to counsel. Hall himself also read his state juvenile and adult Miranda rights. Thus, Hall was told twice, and read himself once, that he had a right to have a parent present during questioning if he wanted.

Indeed, the audiotaped confession and transcript included the second reading of Hall's state juvenile rights and adult Miranda rights by Officer Major at the beginning of the audiotape and prior to Hall's confession. Moreover, twice during the transcript of his confession, at the beginning of the transcript and again at the end, Hall orally confirmed that the officers had read him his state juvenile rights and adult Miranda rights twice and that he understood those rights. During his

audiotaped confession, Hall also acknowledged that he had signed the forms waiving his Miranda rights.

Importantly too, the transcript and audiotape of Hall's confession give no indication whatsoever that Hall was confused or misunderstood the seriousness of the interrogation or the questions he was being asked. Although Hall testified at the suppression hearing that he could not understand his rights, he also admitted that he could in fact read and did not deny the officers twice read out loud his state juvenile rights and adult Miranda rights. Hall has not shown that his intelligence was so low that he could not understand his rights or the consequences of his waiver.

Although Hall was fifteen years and eleven months old at the time he confessed, Hall was only seven months younger than the 16-year-old defendant in Fare whose confession was upheld over 30 years ago. Although Hall was the same age as the defendant in the 1948 Haley decision, Hall was not subjected to the intense pressure tactics or coercive interrogation that the defendants in Haley or Gallegos encountered. Importantly, Hall was not interrogated for an extended period of time. Rather, he was interrogated for only a little over an hour at the station, from approximately 5:42 p.m., when he was first read his Miranda rights, until his confession was audiotaped from 7:06 p.m. to 7:26 p.m. The transcript and

64

audiotape recording of his confession reveal no evidence that he was mistreated by the police, tricked, or coerced into waiving his rights or confessing. When asked during his audiotaped confession whether he had been threatened, Hall stated that he had not been threatened. On the audiotape, Hall confessed to the crime in detail and gave no indication that he was fed facts by the officers (as he now claims), that he was frightened into confessing (as he now claims), or that he did not understand (as he now claims).[39] In fact, the transcript of the confession shows just the opposite. Our review of the audiotape of Hall's confession confirms its voluntariness. The tone of Hall's voice is calm and certain and does not suggest duress. Officer Major speaks in normal tones; his voice is measured and non-threatening.

As to Hall's father, Officers Major and Grant testified that Hall did not request his father be present. And significantly, <u>Hall did not suggest at any time during the 20-minute audiotaped confession that he wanted his father</u>. From this evidence, the state trial court and jury could reasonably determine that Hall did not request his father and deny Hall's motion to suppress.

In any event, even if Hall had requested the presence of his father, this

---

[39]We recognize that Hall had no prior experience with the justice system for him to become familiar with the <u>Miranda</u> warnings. However, Hall could read them, signed the waiver forms, and even had his rights read to him out loud twice by the officers.

65

request would not automatically render his waiver and confession involuntary as a matter of federal law. Regardless of what Alabama law requires, there is no clearly established federal constitutional requirement: (1) that police officers advise juveniles, suspected of state crimes, of a right to have a parent present during questioning, or (2) that interrogation cease upon a juvenile's request for the presence of a parent or guardian.[40]

Nonetheless, we recognize that whether Hall's parent was present is a factor to be considered in the totality of the circumstances. See Fare, 442 U.S. at 725, 99 S. Ct. at 2572. And given the totality of the circumstances shown in this particular record, we cannot say the Alabama courts' determination that Hall's waiver was an unreasonable determination of the facts in light of the evidence presented, nor was it contrary to, or an unreasonable application of, clearly established federal law.

We recognize Hall also contends that the police coerced him because the police (1) read him the facts of the crime from a piece of paper "over and over," (2) told Hall that they had him on a videotape committing the crime, and (3) began threatening Hall, kicked his chair, and hit the desk where he was sitting. Hall

---

[40]On appeal, Hall has not argued that his alleged request for his father's presence was an invocation of his Fifth Amendment rights to remain silent and that the police were required immediately to cease interrogation under Miranda. Therefore, he has waived any such argument. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

claims that he confessed only to keep the officers from "attacking" him. In the state hearings, the officers testified, denied Hall's allegations, and directly contradicted Hall. The conflicting testimony created fact issues for the state court; therefore, the state court's determination that the confession was in fact voluntary, as opposed to coerced, is not unreasonable based on the evidence in the overall record.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Hall next argues that Smedley, as trial counsel, was ineffective because she: (1) did not present expert testimony about Hall's low level of intellectual ability or his difficulty understanding directions, (2) failed to interview or call witnesses to show that Chambers's testimony as to the telephone records was false, (3) failed to call witnesses or "otherwise present available evidence" in support of Hall's alibi defense, and (4) did not call character witnesses. Hall argues that Smedley's errors, individually and collectively, constituted deficient performance which prejudiced his defense.[41]

"'An ineffective assistance claim has two components: A petitioner must

---

[41] In his § 2254 petition in the district court, Hall raised three additional arguments as to why Smedley's performance was deficient that he has not raised on appeal: (1) Smedley had insufficient time to represent Hall effectively, (2) Smedley had insufficient experience to handle Hall's case, and (3) Smedley did not request funds for "an investigator, an expert, or anyone or anything else." Hall has not raised any of these arguments on appeal, and we therefore deem them abandoned. See Access Now, Inc., 385 F.3d at 1330.

show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'" Rhode v. Hall, 582 F.3d 1273, 1279 (11th Cir. 2009) (quoting Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003)), cert. denied, -- U.S. --, 78 U.S.L.W. 3714 (U.S. Jun., 2010) (No. 09-10597)).  In order to satisfy the first prong, a petitioner must prove that his attorney's performance "'failed to meet the standard of reasonableness under prevailing professional norms.'" Id. at 1280 (quoting Newland v. Hall, 527 F.3d 1162, 1184 (11th Cir. 2008)).  In evaluating the performance of counsel, this Court "'indulge[s] a strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Id. Furthermore, we review an attorney's performance "'from counsel's perspective at the time, to avoid the distorting effects of hindsight,'" and the review is objective "'in that we consider whether there was any reasonable justification for the attorney's conduct.'" Id.  "'Thus, the petitioner must establish that no competent counsel would have taken the action that his counsel did take'" in order to satisfy the first prong. Id.

In order for a petitioner to satisfy the second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable

68

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 693-94, 104 S. Ct. 2052, 2067-68 (1984). However, "[t]he prejudice prong does not focus only on the outcome; rather, to establish prejudice, the petitioner must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable." Rhode, 582 F.3d at 1280. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

## A. Hall's Intelligence Level

Hall argues that his trial counsel Smedley failed to present expert testimony, such as that given by Taffett, regarding Hall's low intellectual capabilities. Hall contends that such testimony would have supported (1) Hall's motion to suppress his confession, by showing that he did not understand his rights, and (2) his defense against Leak's accusations that Hall planned the crime.

In response, the State argues that Hall's trial counsel was not deficient in not retaining an education expert because: Hall could read his Miranda rights; the officers also read him his rights at least twice; Hall twice stated he understood

69

them; Hall signed the waiver forms; and thus trial counsel could reasonably conclude no educational expert was needed. The state further argues that Hall's low intelligence would not have prevented the introduction of his confession and thus counsel's performance was not deficient for this reason too.

We need not decide the performance question because Hall has failed to establish the requisite prejudice in any event. For example, after hearing Taffett's testimony, the state trial court, in denying Hall's motion for new trial, stated, "While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible." The state trial court also stated that "defendant's intelligence and age were considered fully at the hearing on the motion to suppress and throughout each of the trials." The state trial court denied Hall's motion for trial even after hearing Taffett's expert testimony about Hall's low intelligence. The trial court had the opportunity to evaluate Hall's level of intelligence and the credibility of his testimony that he did not understand his Miranda rights.

Simply put, Hall has failed to show that evidence of Hall's intelligence would have made a difference in the state court's finding that the confession was

70

voluntary. The Alabama Criminal Court of Appeals affirmed the state trial court's ruling, stating only that "None of the claims raised by the appellant indicate that his counsel rendered deficient performance that resulted in prejudice so as to require a new trial under the strict standard set out in Strickland v. Washington, supra."[42]

Hall has not shown that the Alabama Court of Appeals' conclusion—that there was no reasonable probability that expert evidence of Hall's low intelligence would have resulted in any difference in the admission of his confession or the outcome of the trial—was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of facts.

Similarly, as for whether evidence of his intellectual abilities would have successfully supported Hall's defense at trial, Hall testified at length for the jury, and the jury also heard evidence about Hall's social interactions with his friends, including the coordination of plans to attend the dance, his multiple conference calls, his involvement in a rap group, as well as his possible involvement in gang activity. This evidence gave the jury ample opportunity to evaluate Hall's intelligence level and his social skills. It was neither unreasonable nor contrary to clearly established federal law for the state courts to conclude that additional expert

_____

[42]The Alabama Supreme Court denied Hall's petition for certiorari as to this contention.

testimony on Hall's intelligence would not have raised a reasonable possibility of a different verdict.

**B.     Chambers's Testimony**

Hall also contends that Smedley failed to interview or present witnesses to show that Chambers's testimony was false as to the retention period for BellSouth's telephone records of <u>outgoing</u> local calls.  Had she done so, Hall argues, Chambers's testimony would not have undermined Hall's alibi.

The state trial court, in denying the motion for new trial, concluded that Smedley's performance did not fall below the <u>Strickland</u> standard.  Furthermore, the trial court concluded that there was no prejudice because Chambers's testimony at trial "did not indicate that there were no calls, but [that] 'we have no record of those – any calls for those days,'" and that the testimony of a juror indicated that the jury ignored the evidence of the phone records.  The Alabama Court of Criminal Appeals then affirmed, <u>Hall v. State of Alabama</u>, No. CR-00-1180, slip op. (Ala. Crim. App. Oct. 18, 2002) (unpublished), as did the Alabama Supreme Court.  <u>Ex parte Hall</u>, 863 So.2d at 1081.

The Alabama Supreme Court did not reach the performance prong but agreed with the trial court's ruling that the truth about the telephone records would not have affected the outcome of the trial: "The telephone records, like the other

evidence, merely presented a conflict the jury was required to resolve in assessing Hall's guilt." Ex parte Hall, 863 So.2d at 1083. Furthermore, the Alabama Supreme Court stated, "We cannot say that Hall was prejudiced by his counsel's failure to discover Chambers's false testimony because we have already determined that truthful testimony as to the telephone records would not have altered the outcome of the trial." Id. at 1085.

Hall has failed to show that the Alabama Supreme Court was unreasonable in its conclusion that Hall was not prejudiced by Chambers's false testimony. At trial, Smedley significantly undermined the credibility of Chambers's testimony during cross-examination by pointing out the oddity that BellSouth had no records of any outgoing local phone calls from any of the multiple homes in question for the entire day, despite the testimony of numerous witnesses to the contrary.[43] Moreover, one juror testified that Chambers's testimony was difficult to believe and was largely disregarded by the jury. Finally, even absent the testimony of Chambers, there was significant evidence in the record that Hall was guilty, including his own audiotaped confession and Leak's testimony.

In summary, Hall has not carried his burden to show the Alabama Supreme

---

[43]Also, Chambers did not testify that there were no phone calls on October 15, 1999 but rather that BellSouth records did not show any outgoing phone calls.

Court's decision—that Hall was not prejudiced by Smedley's failure to present evidence of the falsity of Chambers's testimony—was contrary to or an unreasonable application of federal law, or based on an unreasonable determination of facts.

## C.    Failure to Present Additional Alibi Evidence

Hall also contends that he was denied effective trial counsel because Smedley (1) failed to call Pamela Armstrong, Gloria McElroy, and Sunkeissa Cantrell as alibi witnesses and (2) failed to present any other evidence in support of his alibi. In denying his motion for a new trial, the state trial court concluded that Hall's alibi defense was "more tha[n] adequately represented" through the testimony of the witnesses who did testify at trial, and "[a]ny other evidence would have been cumulative." The Alabama Court of Criminal Appeals agreed with these findings.

"[I]t is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." Rhode, 582 F.3d at 1284 (quotation marks omitted). "Counsel is not required to present cumulative evidence or evidence incompatible with the defense strategy." Id. at 1287; see Bobby v. Van Hook, -- U.S. --, 130 S. Ct. 13, 19 (2009) ("[T]here comes a point at which evidence . . . can reasonably be

74

expected to be only cumulative, and the search for it distractive from more important duties."). Furthermore, the decision concerning "which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Rhode, 582 F.3d at 1284 (internal quotation marks and brackets omitted).

A review of the testimony of Sunkeissa Cantrell, Pamela Armstrong, and Gloria McElroy from Hall's first trial reveals no evidence that was not adequately presented through seven other alibi witnesses at trial. Moreover, Smedley testified during the hearing on Hall's motion for a new trial that she called all of the witnesses that, in her judgment, supported her theory of the case. We will not second-guess such decisions by counsel. See Rhode, 582 F.3d at 1284.

The Alabama Court of Appeals' conclusion that further evidence to support Hall's alibi would have been cumulative of other evidence presented at trial was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

D.    **Character Witnesses**

Finally, Hall contends that he was deprived of effective trial counsel because Smedley "did not call persons who had and would have testified as to Darryl Hall's good character." The trial court and the Alabama Court of Criminal Appeals found

75

that Smedley's performance was not ineffective, and that conclusion is not unreasonable. Several witnesses at the third trial testified that Hall was not involved in gang activity. Hall's father testified that Hall had never had serious discipline problems or problems at school. Hall has failed to point to any additional character evidence which would have made any difference in the outcome of the trial. In his appellate brief, Hall merely cites to the testimony in the first trial of Linda Dowe and Gregory Dowe that he had a good reputation.

Again, "it is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." Rhode, 582 F.3d at 1284 (quotation marks omitted). And in any event, Hall has not shown that testimony that he had a "good reputation" would have raised a reasonable probability of a different verdict.

In summary, we conclude that the Alabama courts' conclusion—that Hall's trial counsel was not ineffective—is not an unreasonable determination of the facts in light of the evidence presented, nor is it contrary to, or an unreasonable application of, clearly established federal law.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Hall's § 2254 petition.

**AFFIRMED.**

WILSON, Circuit Judge, concurring in the result:

Hall was a 15-year-old who made statements during a custodial interrogation that were used to convict him, for which he received a sentence of life imprisonment. Three aspects of this case are initially troubling.

The first is that a juvenile was sentenced to life imprisonment for non-capital crimes. However, because it appears from the record that Hall is eligible for parole under Alabama law after ten years, he is unable to make an effort to avail himself of *Graham v. Florida*, 560 U.S. --, 130 S. Ct. 2011, 2034 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.").

Second, Hall was convicted after a third trial, based on evidence that failed to convince two prior juries, which concerned at least one justice on the Alabama Supreme Court. *Ex parte Hall*, 863 So. 2d 1079, 1087–88 (Ala. 2003) (Lyons, J., concurring specially) ("I am troubled by the fact that on two prior occasions, two separate juries were unable to find Hall guilty of the same charges, presumably in face of the same confession and the same evidence contradicting Hall's alibi."). Yet, as Justice Lyons points out, Hall failed to mount a challenge to the sufficiency of the evidence on direct appeal.

Third, the conflicting evidence presented at the hearing on the motion to

suppress *could* have supported a finding that the "greatest care" was not exercised to insure that Hall's statements, made in the absence of his father, were voluntary and free from coercive circumstances. The Supreme Court has stated repeatedly that "the greatest care" must be taken to assure that the confession of a juvenile "was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." *In re Gault*, 387 U.S. 1, 55, 87 S. Ct. 1428, 1458 (1967); *see also Fare v. Michael C.*, 442 U.S. 707, 732–33, 99 S. Ct. 2560, 2576 (1979) (Powell, J., dissenting). But since the Alabama courts' finding to the contrary is an adjudication on the merits, is entitled to AEDPA deference, and is not otherwise contrary to or an unreasonable application of the totality of the circumstances standard set forth by the Supreme Court in *Fare*, I concur in the judgment of the Court.

DIV: Juv          BUREAU: Enforcement          DATE: 10/17/99

NAME: Darryl Pierrie Hall                      AGE: 15 SEX/RACE: M/B
ADDRESS: 3125 Brookwood Drive                  PHONE: 284-1968

CONCERNING: Rape 1st/Robbery 1st/Sodomy 1st Investigation

LOCATION OF INTERVIEW     PAB: YES NO (SPECIFY): Juvenile Division

STATEMENT TAKEN BY: Officer M. L. Major, #348

Beginning time 1906 Hours.

Q:    State your name.
A:    Darryl Hall.

Q:    Darryl, were you read both your Juvenile Miranda Rights and your adult
      Miranda Rights?
A:    Yes, sir.

Q:    Did Officer M. L. Major read you your rights?
A:    Yes, sir.

Q:    Did you sign these rights?
A:    Yes, sir.

Q:    Did you understand these rights?
A:    Yes, sir.

Q:    Your Juvenile Rights were read to you at 1742 Hours?
A:    Yes, sir.

Q:    Your adult rights was read to you at 1744 Hours?
A:    Yes, sir.

alc/A0678

_____          _____
Detective Signature                              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Page ___ of ___    Time:

Q: Okay, Darryl, I'm gonna read these rights to you again. First I'm gonna read you your Juv, your Juvenile Rights, the time is gonna be 0708 Hours, correction, 1908 Hours. Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. If you want to answer questions now you can do so, but stop answering at any time. You have the right to communicate with your parent or guardian before questioning. If necessary, reasonable means will provide for you to do so. Do you understand these rights?

A: Yes, sir.

Q: And did you sign this rights form?
A: Yes, sir.

Q: These are your adult rights and the time now is 1909 Hours. Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. If you want to answer questions now you can do so, but stop answering at any time. Do you understand these rights?

A: Yes, sir.

Q: Did you sign this rights form?
A: Yes, sir.

Q: State your name.
A: Darryl Hall.

Q: Darryl, what's your address?
A: 3125 Brookwood Drive.


alc/A0678


_____

_M. L. Majes_____     _____
Detective Signature                    Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page 2 of 4        Time:

Q: What's your birthday?
A: November the 8th, 1983.

Q: How old are you?
A: Fifteen.

Q: What school do you attend?
A: Cloverdale.

Q: What street is Cloverdale located on?
A: Fairview I guess, Fairview.

Q: Okay. Do you know a subject by the name of Alonzo Leak?
A: Yes, sir.

Q: How do you know Alonzo Leak?
A: We had class together at Cloverdale for the last year.

Q: Did you see Alonzo Leak in Capitol Plaza on Friday, about, on Friday, the date was the 15th of October, 1999?
A: Yes, sir.

Q: Did you see him about 4:00 P.M.?
A: Yes, sir.

Q: Where did you, where did you see him at?
A: Where I first seen him at, at Capital Plaza and then we started talking.

Q: What, what were ya'll talking about?
A: I, well, he was of our gang because I told him you want to go in a gang, and he said man nuh, so I, he finally said yeah, and I told him these are the things you can do.

Q: What did you tell him he had to do to get in a gang?
A: Rob Little People's Workshop.

Q: You told him he had to rob Little People's Workshop in order to get in a gang?
A: Or get beat up.
alc/A0678

_____

*M. L. Mayes*
Detective Signature                          Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q: Yes or no, did you tell him...
A: Yes, sir.

Q: So you did tell him he had to rob Little People's Workshop or to get beat up?
A: Yes, sir.

Q: Okay, what else did you tell him he had to do?
A: Just bad.

Q: Okay, when you told him that what did he say?
A: He said okay.

Q: Did you and him go to the Little People's Workshop?
A: Yes, sir.

Q: When ya'll was walking to the Little People's Workshop what did ya'll discuss?
A: I told him how, how to do it, you go to the front and I'll be on the back. I told Alonzo to go in the front and I, I'll go into the back and watching out and looking and stuff. When he went and did it I walked through the door and then stood there, and he looked at me then he said my name, and then I had him say, say another name.

Q: What name did you say?
A: Joseph Gates.

Q: Joseph Gates or Joseph Grady?
A: Grady.

Q: And where, where, where did you say you lived?
A: On Troy Highway.

Q: Okay, when, how many times did Alonzo go inside this business?
A: About two or three.

Q: Did he go in two times or did he go in three times?
A: I'm pretty sure it three.

alc/A0678

---

__M. L. Mayes__
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____
Page 4 of 14    Time:

Q:   How long did he stay inside this business?
A:   About 15 or 30 minutes.

Q:   Each time he stayed in 15 or 30 minutes, or did he stay in there a total
     of 30 minutes?
A:   Or maybe 30 minutes, yeah, 30 minutes.

Q:   Thirty minutes each time?
A:   Yes, sir.

Q:   When he went in, okay, before you all got to Little People's Workshop
     did you hand him anything?
A:   Yes, sir.

Q:   What did you hand him?
A:   Two guns.

Q:   What type of guns?
A:   .38 and a 9.

Q:   A 9 what?
A:   Millimeter.

Q:   Describe the guns.
A:   The 9 was silver and the .38 was black.

Q:   Where did you get these guns from?
A:   Well a friend I know from a long time ago.

Q:   How long have you had these guns?
A:   About two months.

Q:   What's this friend's name?
A:   Reginald Powell.

Q:   Reginald Powell?
A:   Yes, sir.


alc/A0678

_____

_M. L. Mays_____            _____
     Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q: Do you know where he got them from?
A: No, sir.

Q: Where does Reginald Powell live?
A: Somewhere by base, trailer park.

Q: Trailer park by Maxwell AFB?
A: Yes, sir, ___Inaudible___

Q: Is he a black or white male?
A: Black.

Q: Are these guns stolen?
A: I don't know, he ain't tell me.

Q: Can you repeat that?
A: I don't know, he ain't tell me.

Q: So he went in Little People's Workshop and when he went in the Little People's Workshop his intentions was to rob the place because you told him to rob the place?
A: Yes, sir.

Q: Why did you tell him to rob the place?
A: It's the only way to get in the gang.

Q: And...
A: And I needed, need the money to go to the dance.

Q: What dance?
A: The Homecoming.

Q: At what school?
A: Cloverdale Junior High.

Q: When he was committing the robbery did you enter the building?
A: Yes, sir.

alc/A0678

_____

_M. L. Myers_
    Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q: How many times?
A: About one or two, I'm pretty sure two.

Q: So you...
A: The first time I went I stuck my hand through the door and I stepped in, went back out and I _____Inaudible_____ and then I went back in and stayed for about, about five minutes.

Q: Okay, in those five minutes when you stayed in, in the business, what was Joseph doing?
A: He had the white girl name Crystal and then he told her to get on the ground. She got on the ground and he told her shut up bitch, and then she was crying like help, and then but it seemed he had mouth, hand over her mouth but it seem like she had hers covering up from trying to keep quiet while she was crying.

Q: Okay, did you see him rape her?
A: No, no, sir, I just seen him on the ground and he was standing over her. Then I went back out and I ain't never came back in by the second time.

Q: Okay. The second time when you came in did he hand, hand you anything?
A: No, sir.

Q: When you was inside the building did he hand you any money?
A: No, sir, on the outside.

Q: Did he come out and hand you the money?
A: And we met up and then again he just caught out running down Elsmeade Road and turned in Brookwood.

Q: Okay, ya'll met up and he handed you how much money?
A: He ran out the back door and gave it to me, then he caught out through that way because he knew ain't no way going to that church thing and went back in the yard because it was like a fence back there.

Q: So when he ran out the business he handed you some money?
A: Yes, sir.

alc/A0678

_____

*M. L. Major #348*
_____          _____
Detective Signature                Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page ___ of ___    Time ____

Q: And then both of ya'll went running towards ya'll houses?
A: Yes, sir.

Q: And then ya'll met up again down the street and you gave him some money back?
A: I gave the money right back.

Q: What about the two checks?
A: The checks, I had it but he, he gave it to me so I just ripped them up by Winn Dixie in real small tiny little pieces then I threw it in the ground where it was wet at, and the water just had it on the side.

Q: Okay. Tell me again about when he ran out the building.
A: When he ran out the building he ran out the back door where I was and he stopped and say here man, here man, here. So I got it and then I said hold up man, I gave it back to him.

Q: What did you get?
A: He gave me a check.

Q: And what else?
A: And that's it, he ain't gave me no jewelry or no gun, he kept them two and ran out with it. Then he gave me back them two checks so I just ran toward Winn Dixie in that big old field behind and then tore it up in small pieces and put by in the water where it carry at and it went by. And I ran back home and that when I seen him by that ditch by my house, he slowed down and then when I got in the car he ran.

Q: Did you tell Joseph to kill the people?
A: Yes, sir.

Q: Why did you tell him to kill the people?
A: What recognize us witness.

Q: I can't hear you.
A: Recognize far as the witness.

Q: Why didn't Joseph kill the people?
A: I don't know.
alc/A0678

_____

_M. L. M_____          _____
   Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page ___ of ___   Time ___

Q: Did you tell him to rape the females?
A: No, sir, I told him to rob it.

Q: You told him to rob it?
A: Yes, sir.

Q: Okay, earlier in my interview when we was just talking, you told me you told Joseph he had to rape those girls in order to get in a gang.
A: No, I told him he had to rob the place and get the money, and then gone out. And then when I walked in he was raping her and got the money. He had the money, then he raped the girl who was standing all the way by him.

Q: What else did he take from the girl?
A: He just had them on the ground at gunpoint.

Q: What else property did he take from the business?
A: I think like jewelry or something.

Q: At any point and time did he, did he give you some keys to a car?
A: Yes, sir, and I had went in her car and checked and looked around and I just closed the door and I went back behind.

Q: Who car?
A: Crystal.

Q: How do you know Crystal?
A: From my friend name John.

Q: Did John have anything to do with this?
A: No, sir.

Q: Tell me what type of relationship that you have with Crystal?
A: I know her through John, then we went, when I got to know her from John she was like real cool and friends. She come pick us up every time we go to Super Wal-Mart to get her baby some stuff. And then John told me that she used to over there and go get her, she, she put her little baby daughter inside the day care and she'll like go pick her up every time she come out the school.

alc/A0678

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q: So you know Crystal pretty well?
A: Mostly, likely.

Q: Okay. How many people was inside the business that you know of?
A: Just her.

Q: You said you heard him screaming at other people, right?
A: He was yelling telling be quiet, get down, then he told Crystal to shut up bitch, like that, and she got on, I told you to get on the ground so she got down on the ground, then he stand over her and then, then he told her to shut up and then she started crying.

Q: But how many people that you, how many people do you think were inside the business?
A: Like 15 or 20 grownups and little children.

Q: So you don't know actually how many people was in the business?
A: No, sir.

Q: Because you just stepped in the business and you just saw him and Crystal?
A: And then some more folks like on the side. They was like holding their mouth over and you know keeping quiet when he told Crystal to shut up.

Q: Where do you think these ▉▉ are located?
A: By the ditch way up on Brookwood and the one by my house. I'm pretty sure one by, by his house, the doghouse, the other one he say usually hide all his stuff at and nobody will never find it.

Q: So you're telling me when you met Darryl at Capital Plaza.
A: It's Alonzo.

Q: Correction, you, you are Darryl, correct?
A: Yes, sir.

Q: You met Alonzo at Capital Plaza?
A: Yes, sir.


alc/A0678

_____        _____
Detective Signature                    Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____        Page ___ of ___    Time:

Q: And you told Alonzo to go rob Little People's Workshop to get in a gang?
A: Yes, sir.

Q: He acted on himself when he raped...
A: Yes, sir.

Q: ...those girls?
A: Yes, sir.

Q: Did you ever tell him to rape those girls?
A: No, sir, I just told him to rob and get the money, because I told him what I need the money to go to the Homecoming Dance, and then I ain't, I ain't told him nothing about raping them girls, I ain't say nothing like that, I just said just get the money. And then when he yelled out my name Darryl, I flipped it around and said Joseph Gates, and then I said I live on the Troy Highway, because the only reason I said that keep them from like get out my name and the police like they gonna contact me real quick.

Q: What did you take from the business?
A: What I take, took from them, I ain't take anything.

Q: You said he gave you...
A: Oh, when I was in there I ain't took anything, when I came out he came out and then he looked at me, we started, and he gave me the money half of it then I gave it back to him, and then when I ran down there he gave it back to me, so I cut in the little field behind Winn Dixie and tore it up, rip it apart in real tiny little pieces.

Q: Did you go through any desks?
A: No, sir.

Q: You never touched any type of desk?
A: No, sir.

Q: How far did you actually go inside the business?
A: Like three or four feet.

alc/A0678

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q: Three or four feet? And that's when you saw...
A: The first time it was like one or two feet, the third three or four.

Q: So you went in the building three times?
A: No, I said when the first time I went in there it looked how far I went in like one or two feet, and the second time like three or four feet.

Q: Okay. Is there anything else you want to tell me about what happened?
A: No, sir.

Q: Have you done this at any other businesses?
A: No, sir.

Q: Have you had anybody else committing other crimes?
A: No, sir, first time.

Q: This your first time ever being in trouble?
A: Yes, sir.

Q: Are you affiliated with any type of gangs?
A: No, sir.

Q: How were you gonna get Alonzo in a gang if you are not in a gang?
A: I know some people who, who will put him in a gang because they was talking about it, by last, about two weeks ago. That's how I knew how you can get in, because once he would have dit it I would told them to gone put him in because he did what I had told him, and the probably would have put him in where they stayed at.

Q: When were you suppose to talk to these people?
A: Like the day he did it I probably would have talked to them like, like sometime soon when I would have seen him.

Q: Is there anything else you want to add to this statement?
A: No, sir.

Q: Okay, let me make sure I have everything correct.
A: Yes, sir.

alc/A0678

_____

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q: You saw, did you see Joseph at Capital Plaza?
A: Yes, sir.

Q: Did you give Joseph some guns and tell him to rob Little People's Workshop so he can get in a gang?
A: Yes, sir.

Q: When he first, when he went in the building did you go around the back to be a lookout?
A: Yes, sir.

Q: Did you know exactly what he was going to do?
A: Yes, sir, but I ain't know he was going to rape them girls.

Q: Okay.
A: He took that, he took that out his own hands, he raped them.

Q: Did you at one time receive some of the property from the business and give it back to Joseph?
A: Yes, sir.

Q: Did you tear up some checks and let them run in some water so they can go in the drainage ditch?
A: Yes, sir.

Q: Did you do this behind Winn Dixie?
A: Yes, sir.

Q: Did you get the guns from a black male name Reginald Powell?
A: Yes, sir.

Q: And Reginald Powell live in the trailer park by Maxwell Air Force Base?
A: Yes, sir.

Q: Did you cash those checks at Winn Dixie?
A: No, sir.

Q: Did you tell me earlier you cashed those at some Winn Dixie?
A: Yes, sir.

alc/A0678

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page _2_ of _4_    Time:

Q: Reginald Powell, is he in any type of gang?
A: He kind of like he was Crip, like every time we talk on the phone he will pretend like he Crip and stuff.

Q: How old is Reginald?
A: Sixteen.

Q: And you have no idea where he got those guns from?
A: No, sir.

Q: What time did all this take place?
A: Talking about during the robbery?

Q: Yes, sir.
A: About four or five.

Q: And it took ya'll between 30 minutes, a hour to commit this crime?
A: Yes, sir.

Q: And you was advised of your Miranda Rights, both your Juvenile and Adult Miranda Rights by myself?
A: Yes, sir.

Q: And you were read your Miranda Rights twice?
A: Yes, sir.

Q: Both?
A: Yes, sir.

Q: Which you understood?
A: Yes, sir.

Q: Has any threats been made to you?
A: No, sir.

Q: Do you have anything else to add to this statement?
A: No, sir.

Ending time 1926 Hours.
alc/A0678

_____

_M. K. M_____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page ___ of ___   Time: