[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11744

_____

JIMMIE L. BOWEN,

Petitioner-Appellee,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23952-KMW

_____

Before WILSON, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

State criminal defendants can receive federal habeas corpus relief under 28 U.S.C. § 2254 only in limited circumstances. One of those is when the state court whose decision is under review decided an issue in a way that involved an "unreasonable application" of clearly established federal law. Jimmie Bowen says the Florida courts did just that in his case. He argues that the Florida trial court clearly violated *Miranda* by refusing to suppress incriminating statements he made to a fellow suspect when police placed the two in an interrogation room after he had invoked his right to counsel. The district court agreed and overturned his conviction. But the Supreme Court's cases are—at best—murky on when putting two suspects in a room together qualifies as interrogation under *Miranda*. Because reasonable jurists could disagree about whether Bowen was "interrogated" in the interview room, federal courts lack the power to upset his state criminal conviction. We therefore reverse the district court.

**I.**

Jimmie Bowen and his gang, New Moneii, had a bone to pick with Pierre Roche, who was selling drugs on New Moneii's turf. Years before, the gang's leaders had shot Roche for the same perceived violation—but he did not change his habits. The turf dispute continued, and when sixteen-year-old Bowen spotted Roche playing dominoes nearby, he hatched a plan to execute him. This time, the gang got its target. Bowen killed Roche, shooting him from close range. He even stood directly over him, firing

more rounds to make sure the grisly task was complete. But Roche was not the only victim. Bowen also wounded Christopher Smith, another dominoes player, and shot and killed Derrick Days, Jr.—a ten-month-old baby sitting in his father's lap across the table.

Bowen was not immediately identified. He was wearing a face covering, and witnesses could describe him only as a black male, roughly five feet eight inches tall. The police had no leads until an associate of Bowen's identified him as the shooter. That same person also told the police that Bernard Jones, a seventeen-year-old member of the New Moneii gang, was the getaway driver. Bowen and Jones were soon arrested.

The detectives first questioned Bowen and Jones separately. After they advised Bowen of his *Miranda* rights, both he and his mother invoked his right to counsel. The detectives then ceased their questioning and left the interrogation room. Jones, by contrast, waived his *Miranda* rights and spoke with Detective Jean Solis that same day. The details of their conversation are not clear, but at one point while they were together, Solis observed that Bowen was calling Jones's cell phone. Jones did not pick up.

Some time after Bowen invoked his rights, Solis moved him to a second interrogation room. Soon enough, Jones was there too. Solis informed the two suspects that they would remain there until transportation to the Juvenile Assessment Center could be arranged. He activated audio and video recording in the room, but neither Solis nor any other law enforcement officer asked either suspect to speak with the other about the murders. Nor did anyone

promise any benefit to one suspect in return for seeking information from the other.

Even so, the two began talking almost immediately. The microphone in the room picked up several incriminating statements from Bowen, who implicitly acknowledged that he was the shooter (and that Jones was the driver), accurately described the scene of the crime, and incredulously wondered how the police had "the two right motherf***ers." He and Jones, Bowen said, were the only living people to "know the truth."

The state brought charges, and Bowen moved to suppress his statements to Jones, alleging violations of the Fourth, Fifth, and Sixth Amendments, the Florida Constitution, and Florida's wiretap statute. Bowen testified that he talked with Jones because he "wanted to," and knew that he could have refused to do so. Still, he argued that Detective Solis, by placing Jones in the interview room with him after he had invoked his *Miranda* rights, effectively "interrogated" him in violation the Fifth Amendment.

At the suppression hearing, Solis shared several motivations for putting Bowen and Jones in the room together. He first testified that it was so they could await transportation to the Juvenile Assessment Center. But he later admitted to recognizing that the two suspects might speak to each other about the murders— indeed, hoping they would—and conceded that this possibility informed his decision to put them in the same room. After taking evidence and hearing arguments, the state court issued a short oral ruling denying Bowen's suppression motion.

At the end of the trial, before both sides began their closing arguments, Bowen renewed his motion to suppress. The state court again denied it, and the jury found Bowen guilty on all counts. The court sentenced him to life in prison with judicial review after twenty-five years. He appealed to the Florida district court of appeal, arguing, among other things, that the trial court erred when it denied his motion to suppress. The appeal was denied without opinion. *Bowen v. State*, 184 So. 3d 533 (Fla. Dist. Ct. App. 2016). Bowen subsequently filed several other state post-conviction motions, all of which were also denied.

He then moved to federal court, filing a petition for habeas corpus under 28 U.S.C. § 2254. The petition raised several claims related to Bowen's interrogation-room statements to Jones, including that his placement in the room violated *Miranda*, federal and state guarantees of due process, and the state wiretap statute.

Faced with the limited rationale offered in the state court's oral ruling, the magistrate judge properly attempted to theorize what reasoning could have supported that court's denial of the motion to suppress. *See Harrington v. Richter*, 562 U.S. 86, 98, 102 (2011); *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1035–41 (11th Cir. 2022) (en banc). The only plausible theory, she concluded, was that placing Bowen and Jones together did not amount to custodial interrogation. *Bowen v. Sec'y, Florida Dep't of Corr.*, No. 19-23952-CV, 2020 WL 13281250, at *7–8 (S.D. Fla. July 29, 2020). But despite recognizing AEDPA's deferential standard of review, the magistrate judge found the state-court ruling

"patently unreasonable." *Id.* at *10. The district court agreed and granted the petition, concluding that "'clearly established' Supreme Court precedent left no 'fairminded' dispute" about the alleged *Miranda* violation. *Bowen v. Dixon*, No. 19-CIV-23952, 2022 WL 1521983, at *1 (S.D. Fla. May 13, 2022). This appeal followed.

## II.

We review a district court's ruling on a petition for habeas corpus de novo. *Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019).

## III.

Under the Antiterrorism and Effective Death Penalty Act of 1996, also known as AEDPA, a federal court may not grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court," unless the adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court adjudication qualifies as "contrary to" clearly established federal law if that court contradicted the Supreme Court on a question of law, or if it arrived at a different conclusion than the Supreme Court did in a case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). And a state-court adjudication involves an "unreasonable

application of" clearly established federal law if the decision was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quotation omitted).

By this standard, to justify habeas relief a Supreme Court precedent must "clearly *require* the state court" to have adopted a different result. *Kernan v. Cuero*, 583 U.S. 1, 3 (2017) (per curiam). The unreasonable-application standard is thus significantly higher than a showing that the state court was incorrect, or even that it clearly erred. *Shinn*, 592 U.S. at 118. The bottom line is this: a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Pye*, 50 F.4th at 1034 (quoting *Richter*, 562 U.S. at 101).

On each claim for relief, we review the "last state-court adjudication on the merits." *See Greene v. Fisher*, 565 U.S. 34, 40 (2011). But when that final merits adjudication does not offer specific reasons in support of its holding, we "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Still, even when "looking through" to another opinion, federal courts must defer to the state court's *ruling*, not its specific *reasoning*. *Pye*, 50 F.4th 1035–41. Put simply, state-court decisions must be "given the benefit of the doubt"—there must have been "no reasonable basis" for the state court's action.

8                    Opinion of the Court                    22-11744

*Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)); *Richter*, 562 U.S. at 98.

That is because federal habeas review of state convictions "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Richter*, 562 U.S. at 103 (quotation omitted). State courts—not federal—"play the leading role in assessing challenges to state sentences based on federal law." *Shinn*, 592 U.S. at 124. The federal judiciary is a backstop, guarding against only "extreme malfunctions" in state courts, not engaging in "ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (quotation omitted). AEDPA's standards are thus highly deferential and "difficult to meet"—intentionally and for good reason. *Pinholster*, 563 U.S. at 181 (quoting *Richter*, 562 U.S. at 102).

Habeas review, in short, is a uniquely powerful form of federal intrusion into state affairs. AEDPA significantly—and appropriately—constrains federal-court forays into state convictions, denying us the authority to correct all but the most obvious, and least arguable, state-court errors.

**IV.**

We now apply those standards here. Bowen argues that his state conviction should be vacated because his self-incriminating

statements were the product of a *Miranda* violation.[1]  Specifically, he claims that Officer Solis's decision to place him in a seemingly private space with a fellow suspect amounted to an interrogation—and thus a violation of *Miranda*—under *Rhode Island v. Innis*, 446 U.S. 291 (1980).  Bowen, however, relies on an incomplete account of the Supreme Court's precedents on interrogation, and the Florida courts reasonably concluded that his *Miranda* rights were not violated.  Habeas relief is not appropriate because fairminded jurists, applying clearly established federal law to this record, could (rather straightforwardly) agree with the state court that Solis did not violate Bowen's *Miranda* rights.

## A.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In service of this privilege, the Supreme Court held in *Miranda v. Arizona* that the government may not use

---

[1] At oral argument, counsel for Bowen also argued, for the first time, that the state court did not rule on the merits of the Fifth Amendment claim.  We do not consider this argument as it was not raised squarely before the district court.  *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).  But even in the face of light reasoning—it was, after all, an oral ruling—we easily conclude that the court did rule on the *Miranda* claim.  To start, federal courts generally presume that a state court rules on the merits when it denies relief after a federal claim has been presented.  *Richter*, 562 U.S. at 99.  Neither party disputed that presumption before the district court.  *See Bowen*, 2020 WL 13281250, *report and recommendation adopted*, *Bowen*, 2022 WL 1521983.  And as a matter of logic, the trial judge could not have allowed the statements to be introduced without rejecting Bowen's Fifth Amendment claim.

statements offered while a suspect was in "custodial interrogation" unless that suspect was informed of his rights. 384 U.S. 436, 444 (1966). This post-arrest catechism is known as the *Miranda* warning. Once that warning is made, if an individual invokes his right to counsel, interrogation cannot resume until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

But *Miranda* does not require a warning, or otherwise impose restrictions, anytime police speak with someone—even if that someone is a suspect. Instead, its protections apply only in custodial interrogation. Custodial interrogation, in turn, is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *Rhode Island v. Innis* further clarified that definition (or muddied it, depending on who you ask). There, the Court explained that interrogation includes both "express questioning" and "its functional equivalent." *Innis*, 446 U.S. at 300–01.

The functional equivalent of express questioning, according to *Innis*, encompasses "any words or actions" by the police that they "should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted). This part of the definition is objective, focusing "primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Although the officer's subjective intentions may remain relevant to the analysis, that is only because those intentions can inform the objective inquiry. An action designed to elicit an incriminating

response, for example, is more likely to be one the officer should know is objectively likely to do so.  *Id.* at 301 & n.7.

"Interrogation" is more than just "subtle compulsion."  *Id.* at 303.  Under *Miranda*, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Id.* at 300.  Still, as Bowen emphasizes, the Supreme Court has recognized that any police knowledge of a suspect's "unusual susceptibility" to a "particular form of persuasion" can inform whether the officer should have known the action taken was reasonably likely to elicit an incriminating response.  *Id.* at 302 n.8.

What Bowen does *not* emphasize is that even after this elaboration, the *Innis* Court found no interrogation.  *See id.* at 302.  There, the police—with suspect Innis in the back of their car in easy earshot of the conversation—had talked among themselves, expressing their concern over a missing shotgun near a school for handicapped children.  *Id.* at 294–95.  Innis remained silent at first, but as the officers continued to worry out loud about the children's safety, he divulged the gun's location.  *Id.*  The Supreme Court concluded that such "subtle compulsion" was not the functional equivalent of interrogation and that Innis's *Miranda* rights were respected.  *Id.* at 302–03.

Over time, the Supreme Court has elaborated on *Innis*'s definition of interrogation, emphasizing that whether a given police practice amounts to interrogation must be determined in light of *Miranda*'s purpose: "preventing government officials from using the coercive nature of confinement to extract confessions

that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529–30 (1987). In *Mauro*, for example, the Court found no error when the police allowed a suspect's wife to speak to him after he had invoked his *Miranda* rights. *Id.* at 521–25. The police admitted they knew it was "possible" that Mauro would incriminate himself, yet refused to allow the conversation unless it was recorded and an officer was present. *Id.* at 522–24. The state court concluded that an incriminating statement was "reasonably likely" under *Innis*'s standard. *Id.* at 524–25. The Supreme Court disagreed. It reversed, emphasizing that Mauro was not subject to any "compelling influences, psychological ploys, or direct questioning." *Id.* at 525–30.

The majority and dissenting opinions in *Mauro* debated whether incrimination was just a "possibility" as opposed to "reasonably likely," or even "highly probable" on the facts of that case, and struggled to weigh the importance of the officers' admissions about their subjective intentions. *See id.* at 526–28; *id.* at 531–36 (Stevens, J., dissenting). Ultimately, the Court concluded that *Innis*'s standard was not violated: the police had a permissible purpose for sending Mrs. Mauro in to see her husband, and allowing the two of them to speak was not the functional equivalent of interrogation. *Id.* at 528–30 (majority opinion).

The majority, at least indirectly, suggested that the *Miranda* inquiry should be infused with the core of the Fifth Amendment privilege—protection against coercion. That it was Mrs. Mauro's idea to speak to her husband became highly relevant; how could a

conversation, held at the parties' own insistence, compel them to speak? *See id.* at 528.  Given that Mauro "could have chosen not to speak to his wife," his "volunteered statements" were not properly considered the "result of police interrogation." *Id.* at 528 n.5, 529 (quotation omitted).  Allowing someone to be in a position where they may choose to make incriminating statements is not the "kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." *Id.* at 527.  After all, officers "do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.* at 529.  So there was no "interrogation" when law enforcement officers were only witnesses to a conversation between the accused and his spouse—even though they knew about and recorded the conversation. *Id.* at 529.

Likewise, schemes to "mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  In *Perkins*, police placed an undercover agent in a jail cell and instructed the agent to engage a suspect in casual conversation and report back anything he heard about a murder they were investigating. *Id.* at 294–95.  Without first reading the suspect his rights, the agent asked him if he had ever "done" anybody, at which point he made incriminating statements about the murder. *Id.*  The Supreme Court decided that even this did not violate *Miranda*'s protections. *Id.* at 296–300.  "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" because the "essential

ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Id.* at 296.

The Court emphasized that "*Miranda* forbids coercion, not mere strategic deception," and coercion "is determined from the perspective of the suspect." *Id.* at 296–97 (citing *Innis*, 446 U.S. at 301). There is no coercion, the Court said, when the officer "wears not police blue, but the same prison gray." *Id.* at 297 (quotation omitted). Perkins, unaware that he was talking with an undercover agent, could not have been coerced into speaking because he had "no reason to think that the listeners [had] official power over him." *Id.* Thus, in conversations where "the suspect does not know that he is speaking to a government agent," there is "no reason to assume the possibility that the suspect might feel coerced"—which means *Miranda* protections do not apply. *Id.* at 299.

The *Perkins* Court made explicit what had been suggested in *Mauro*: some measure of compulsion is required before *Miranda* rights attach. So the "reasonably likely" language from *Innis* does not eliminate the fundamental requirement of coercion in deciding whether police conduct is the functional equivalent of interrogation. Courts instead must enforce the principles underlying the Fifth Amendment privilege—a proscription against compelled testimony. *See* U.S. Const. amend. V.

**B.**

A fairminded jurist, applying the *Innis–Mauro–Perkins* trio of cases, could conclude that Solis's decision to place Bowen in an

interrogation room with Jones was not a *Miranda* violation. These cases certainly do not "clearly *require* the state court" to have reached the opposite conclusion. *See Kernan*, 583 U.S. at 3. In fact, they show that police actions that lead to a suspect making incriminating statements to a third party are the functional equivalent of interrogation only if they involve some "psychological ploy" with sufficient coercive elements. *See Mauro*, 481 U.S. at 527; *Perkins*, 496 U.S. at 297.

Here, there was no psychological ploy. Like the wife in *Mauro*, Jones was operating completely independently from the police, as was Bowen, who spoke to Jones only because he "wanted to." And just like the suspect in *Perkins*, Bowen did not believe that he was in the presence of law enforcement officers, so it is not at all clear why he would have felt the coercive pressure of police interrogation. A fairminded jurist could thus conclude that placing Bowen and Jones in a room together was the strategic use of a neutral situation rather than a coercive psychological ploy.

Yes, an officer's knowledge of a suspect's young age may be relevant because the risk of coercion is more "acute" when "the subject of custodial interrogation is a juvenile." *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 277 (2011); *see also Innis*, 446 U.S. at 302 n.8. But relevancy is not the same as certainty. Far from it. Neither *J.D.B.* nor any other case affirmatively *requires* a court to determine that Bowen's youth was dispositive here.

What's more, it is not obvious that all jurists would agree that it was reasonably likely that Bowen would incriminate himself

if Jones was placed in the same room.  The Supreme Court has not provided much guidance on *Innis*'s "reasonably likely" language, but *Mauro* instructs us that a mere "possibility" of incrimination is not enough.  *See Mauro*, 481 U.S. at 528–29.  Here, Solis did not interrogate Bowen merely by "hoping" he would incriminate himself.  *Id.* at 529.  And there is room for disagreement about whether it was "reasonably likely" that Bowen would do so.  After all, he had been arrested and read his rights many times before— and fully understood that he could have refused to speak to anyone.  That Bowen *did* incriminate himself is not enough to show with certainty that it was reasonably likely that he would do so when Jones was placed in the room.

In short, the facts place Bowen's challenge in a gray area that is not unambiguously dictated by Supreme Court precedent.  That is the exact type of case where § 2254 relief is inappropriate.

⋆        ⋆        ⋆

Federal courts have the power to overturn state criminal convictions only in exceptional circumstances.  This is not one of them.  The Florida court's decision was not "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'"  *Shinn*, 592 U.S. at 118 (quoting *Richter*, 562 U.S. at 103).  Accordingly, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings not inconsistent with this opinion.

22-11744     WILSON, J., Concurring in the Judgement                    1

WILSON, Circuit Judge, concurring in the judgment:

Due to AEDPA's deferential standard of review, I concur in the majority's judgment. I write separately to emphasize the significance of the defendant's age and the heightened concern that should attach to cases involving juveniles.

Our precedent maintains that *Miranda* rights are not implicated where "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990); *see also United States v. Stubbs*, 944 F.2d 828, 832 (11th Cir. 1991) (applying *Perkins* to find that "*Miranda* and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the information—whether voluntarily or by prearrangement—to law enforcement officials.").

*Miranda*, as the majority appropriately explains, turns on the presence of a custodial interrogation, defined as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Here, a co-defendant was placed, albeit purposefully, in the same interrogation room with Bowen. Bowen confessed to this co-defendant, and the police recorded the confession. These facts are not sufficiently different from *Perkins* to warrant finding that the state's decision was "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

But what I do find troubling is how Bowen's age interplays with the voluntariness of his confession. At the time he was taken

into custody, Bowen was only sixteen years old with a ninth-grade education.  Prior to being left in the interrogation room, he clearly invoked his *Miranda* rights, as did his mother on his behalf.

In *Hall v. Thomas*, I also wrote separately to emphasize that "the greatest care must be taken to assure that the confession of a juvenile [is] voluntary."  611 F.3d 1259, 1294 (11th Cir. 2010) (Wilson, J., concurring) (internal quotations omitted). Ascertaining voluntariness requires understanding the totality of the circumstances that led to a waiver and confession, including evaluating "'the juvenile's age, experience, education, background, and intelligence, and [] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'"  *Id.* at 1285 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  Voluntariness will thus turn on whether "the entire record was before the state court . . . and [whether] the record amply supported that finding." *Id.* at 1287.

The year after *Hall*, the Supreme Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that [inquiry]." *J.D.B. v. North Carolina*, 564 U.S. 261, 277 (2011).  In reaching this conclusion, the Court wrote that "[t]ime and again," it has expressed that children are to be held in a different light than adults, seeing as they "generally are less mature and responsible than adults" and more vulnerable and

22-11744      W<span>ILSON</span>, J., Concurring in the Judgement                    3

susceptible to influence and psychological damage.  *Id.* at 272 (quotations omitted).

Below, citing to *J.D.B.*, the district court explained that the risk of an involuntary confession is "acute" when dealing with juveniles.  *Id.* at 269.  I echo their sentiments here.  My analysis diverges with the majority in that I believe the majority treats *J.D.B.* too lightly.  The majority writes that in considering a suspect's young age, "relevancy is not the same as certainty. . . . Neither *J.D.B.* nor any other case affirmatively *requires* a court to determine that Bowen's youth was dispositive here."  I do not contend that age should be dispositive.  I do however, as I wrote in *Hall*, contend that the "greatest care" should be exercised to ensure that a juvenile's statements were voluntarily and freely given.